Clara **CARLUCCI**, etc., Plaintiff,

v.

**PIPER AIRCRAFT CORPORATION,**
Defendant.

James **ALLABY** and Sheila
Howe, Plaintiffs,

v.

**PIPER AIRCRAFT CORPORATION,**
Defendant.

Mary Alice **CHERTKOW**, etc., Plaintiff,

v.

**PIPER AIRCRAFT CORPORATION,**
Defendant.

Nos. 78–8370–Civ–JCP to
78–8372–Civ–JCP.

United States District Court,
S.D. Florida.

March 30, 1984.

As Amended July 2, 1984.

Louis G. Davidson & Associates, Ltd., Louis G. Davidson, and John Davidson, Chicago, Ill., Cone, Wagner, Nugent, Johnson, Hazouri & Roth, P.A., Ward Wagner, Jr., and Mark Clark, West Palm Beach, Fla., for plaintiffs.

Mendes & Mount, Paul Moran, and Joseph Asselta, New York City, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Francis Anania, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM J. CAMPBELL, Senior District Judge.

On January 20, 1984, plaintiffs filed their Third Motion to Strike Answer and Motion for Attorneys' Fees and Costs. The Court granted an initial extension of time for the defendant to reply and at the conference held on January 27, 1984 granted an additional extension for a response. At that conference, I stated:

"I have reviewed Plaintiffs' third motion for sanctions and the matters raised therein cause me great concern. Very serious claims are made regarding the unexplained disappearance of some of Piper's documents, which coincidentally are the records dealing with the testing and development of the specific component claimed to be defective in this case.

Defendant has not yet responded to that motion and I have decided to grant Piper's motion for an extension of time to respond to it. But I expect and hereby direct Piper to prepare a comprehensive response addressing each set of documents not produced, detailing by affida-

vit or otherwise the past custody of those documents and the efforts it has made to locate them." Tr. pp. 12–13.

I also denied Piper (as well as the plaintiffs) leave to seek discovery on the issue of destruction of documents pending its response, since the issue at that time was Piper's good faith, i.e., what it knew about the missing documents and what it had done to find them. In any event, it later became apparent that the witnesses Piper wished to depose had been previously interrogated by it on numerous occasions regarding the same matter.

Thereafter, I granted an additional extension of time to the defendant to respond and on February 27, 1984, approximately five weeks after the motion was filed, defendant's response was filed. I found it patently insufficient. Only one affidavit was submitted and it did not detail the efforts Piper had made to locate the missing documents nor did it provide information regarding the past custody of the documents. Therefore, I ordered an evidentiary hearing on the motion to develop the record and to provide an additional opportunity for the defendant to present this information. It again failed to do so. At the conclusion of the hearing the parties were given ten days to file simultaneous briefs. Upon review of the briefs, the record in this cause, and the evidence presented at the hearing, I hereby grant the plaintiffs' Motion to Strike Defendant's Answer and enter a finding of liability against the defendant in this cause.

The complaints in these actions sought damages for the deaths of three men who perished in a crash of a Piper Cheyenne II at Shannon, Ireland on November 12, 1976. The pilot took off in low visibility conditions and soon thereafter lost control of the plane and it crashed into the ground killing all five aboard. The plaintiffs alleged various design defects relating to the longitudinal stability of the aircraft including that the plane was not aerodynamically sound, that its Stability Augmentation System (SAS) was dangerous and that the maximum weight and center of gravity (c.g.)

specifications were misleading and inadequate. The complaint sought relief under numerous legal theories: negligence, express and implied warranties, strict liability, and wrongful death.

The following is a chronological summary of the significant events in this cause:

11/9/78 Complaints filed in the three cases.

12/22/78 Answers filed by defendant.

4/16/78 Joint stipulation for consolidation of the three cases for purposes of discovery.

12/31/81 In response to discovery dispute arising from plaintiffs' request for production of documents, Judge Paine orders parties to confer in good faith to resolve discovery disputes. Order includes list of categories of documents which are legitimate subjects of discovery.

3/5/82 As the result of the failure of the parties to resolve discovery dispute, Judge Paine orders hearing for April 2, 1982. (Subsequently, hearing is reset for May 18, 1982.)

5/18/82 Discovery hearing held. Judge Paine directs that production occur in Lock Haven, Pennsylvania (Piper's factory).

6/11/82 Judge Paine enters order discussed at discovery hearing listing documents to be produced by defendant. The list of documents is identical to the one contained in the order of December 31, 1981; the only modification is the requirement that originals be produced. The order specifically provides that the production session shall continue until all documents are produced and identified.

6/14/82 Document production session held in Lock Haven with Richard Reeder as deponent. Proceedings unilaterally terminated after one day by Mr. Anania.

7/15/82 Plaintiffs file Motion to Strike Pleadings, etc., seeking sanctions for defendant's conduct at Lock Haven session.

7/21/82 Defendant files status report regarding discovery proceedings.

7/27/82 Defendant files Response to Plaintiffs' Motion to Strike Pleadings, etc.

11/17/83 Judge Paine enters order with memorandum finding Piper and its counsel, Mr. Anania, in bad faith for violating the court's order of June 11, 1982 in five respects at Lock Haven session, assesses fees and costs incurred by plaintiffs as sanction against Piper as well as requiring the documents to be produced at plaintiffs' counsel's office.

11/29/83 Defendant files Motion for Rehearing of Judge Paine's order and Motion for Protective Order seeking to postpone document production session and to have it occur at Lock Haven.

11/30/83 In Judge Paine's absence and with his authority, Judge Campbell denies defendant's Motion for Rehearing and Motion for Protective Order but grants relief to the extent that the document production session is postponed until December 5, 1983.

12/1/83 Defendant files Motion for Stay and Motion for Rehearing; hearing held in West Palm Beach before Judge Campbell and the motions are denied in open court on that day.

12/2/83 Defendant files Petition for Mandamus with Court of Appeals and Motion for Stay is granted by the Court of Appeals.

12/5/83 Court of Appeals denies Petition for Writ of Mandamus, vacates stay, and denies Petition for Rehearing.

12/6–20/83 Document production session occurs at plaintiffs' counsel's office in Chicago with Richard Reeder as deponent. Session unilaterally terminated by defendant.

12/7/83 Parties appear for hearing before Judge Prentice Marshall of the Northern District of Illinois in Chicago.

12/11/83 Cause referred to Judge Campbell by Judge Paine for all pending and future pretrial matters.

12/21/83 Plaintiffs appear before Judge Marshall for hearing.

12/22/83 Judge Campbell enters memorandum denying defendant's Motion for Sanctions and noting further delaying tactics by the defendant.

12/28/83 Pretrial status conference held before Judge Campbell in West Palm Beach.

12/29/83 Judge James R. Knott appointed as Special Master to preside over all discovery proceedings.

1/3/84 Plaintiffs file Second Motion to Strike Answer, etc. arising out of defendant's conduct in Chicago.

1/4–10/84 Document production session continues in West Palm Beach before Judge Knott with Richard Reeder as deponent.

1/20/84 Plaintiffs file Third Motion to Strike Answer, etc., raising issue of missing documents.

1/27/84 Conference with parties and Judge Campbell in Chambers at which briefing schedule is set for plaintiffs' Third Motion to Strike Answer, etc. The Court orders that no discovery regarding alleged destruction of documents will be permitted until defendant's response is filed.

2/27/84 Special Master enters written discovery order. Defendant files Response to Third Motion to Strike, etc.

2/29/84 Judge Campbell schedules evidentiary hearing on plaintiffs' Third Motion to Strike Answer and sets it for March 8, 1984.

3/7/84 Special Master files the interim report and describes defendant as having "demonstrated an attitude of indifference in responding to requirements in the discovery process."

3/8–9/84 Evidentiary hearing on Third Motion to Strike held in West Palm Beach before Judge Campbell. At conclusion of hearing Court orders simultaneous briefs to be filed by March 19, 1984.

3/19/84 Simultaneous briefs filed by parties on plaintiffs' Third Motion to Strike Answer.

This cause was referred to me by Judge Paine on December 11, 1983. I reviewed the record and came to the conclusion, as did Judge Marshall of Chicago, see December 7, 1983, Tr. pp. 5–6, that the case was shocking. The defendant had delayed and obstructed discovery to the extent that the case was five years old and nowhere near ready for trial.

Judge Paine's order of November 17, 1983 found the defendant and its counsel to have acted in bad faith for violating his June 11, 1982 order regarding discovery. Judge Paine detailed the numerous instances of discovery misconduct and concluded:

"In the instant litigation, the defendant has shown a chronic, obstructionist attitude toward production of the materials being sought by plaintiffs, even in the face of a Court order compelling production." P. 16.

He warned defendant:

"Such behavior sorely tests the limits of tolerance and defendant is hereby instructed that further obstruction of the discovery phase shall be met with appropriate sanctions." P. 17.

One of the sanctions Judge Paine imposed was that:

"Defendant is further instructed to produce forthwith all materials which fall within the confines and categories of the court's June 11 order in original form at a location and time convenient to plaintiffs, with costs for copying or reproduction to be borne by defendant." P. 17.

The document production session commenced in Chicago on December 6, 1983. On December 8, 1983, defendant filed a Motion for Protective Order to suspend the proceedings so that its lead counsel could attend the depositions in Ireland. On December 9, 1983, I denied that motion. On December 19, 1983, defendant filed another Motion for Protective Order claiming that plaintiffs' counsel were engaging in "harassing, oppressive and dilatory tactics". Without awaiting a ruling by the Court, defendant unilaterally terminated the document production session. Thereafter, plaintiffs filed their Second Motion for Sanctions alleging continued misconduct on the part of defendant and its counsel.

At the status conference on December 28, 1983, I indicated that I would take under advisement the issue of sanctions, noting specifically, however, my concern regarding defendant's unilateral termination of the production session in violation of Judge Paine's order. But my immediate concern was to recommence discovery and to complete it expeditiously so the case could be tried on April 16, 1984. Because the personal animosity between the lawyers had reached a point where unsupervised discovery was impractical, I appointed a Special Master to oversee all discovery proceedings. I intended to proceed with a clean slate:

"When I consider that matter [sanctions], I will consider your conduct from here henceforward, and advise defense counsel, who has already been held in bad faith, that they may purge themselves of the necessity for further sanctions. I'll decide that when I see how you cooperate in the discovery process from now on." Tr. p. 6.

I was disappointed to find, however, that the defendant was not going to be cooperative. The Special Master, who bore the brunt of the hardship, entered an Interim Report on March 7, 1984 stating:

"[D]efendant has demonstrated an attitude of indifference in responding to requirements in the discovery process." P. 4.

The Special Master supported his assessment with specific examples of misconduct. My review of the record confirms Judge Knott's conclusion and I describe some additional examples of obstruction and delay in the "Discovery Misconduct" section, infra.

Additionally, plaintiffs' Third Motion to Strike Answer, etc. raises the issue of defendant's alleged destruction of documents. The section immediately following discusses certain types of documents which were not produced by the defendant. The categories of documents discussed are not in-

tended to be exhaustive as there are other groups of documents which were not fully produced, i.e., modification sheets and data regarding the rigging of the SAS system, etc. I address those categories of documents which highlight defendant's pattern of conduct and which provide a background for the "Destruction of Documents" section which follows. The discussion of "Discovery Misconduct" is separate because that is an additional basis, independent of the destruction of documents, for the entry of a default as a sanction.

## DOCUMENTS RELATING TO IRISH CRASH

On September 14, 1981, plaintiffs filed a request for production of documents which included in paragraph 12 the following request:

"All documents relating to the investigation of the crash complained of, to the site or investigation thereof, to the wreckage or parts therefrom, or to persons having knowledge of any of the foregoing (including witnesses)."

Defendant requested and received from the court an extension of time to respond to the plaintiffs' discovery request. On October 20, 1981, defendant filed its objections to the document production request, stating in response to paragraph 12:

"The defendant objects to this request on the grounds that it is work product; privileged; overbroad and burdensome; unlimited as to time and scope."

On December 31, 1981, Judge Paine specifically noted that the production of the crash investigative data was a legitimate subject of discovery. At the hearing on May 18, 1982, Judge Paine specifically asked counsel for Piper:

"Now, have you produced the accident investigation reports, item 5 in the order I entered back in December—accident investigation reports?" Tr. p. 14.

Mr. Anania responded:

"Your Honor, I haven't produced any of the documents, because I was told such production would be unacceptable; and Your Honor, I saw no practical rea-

son to proceed with the compilation of all these documents if at some future time plaintiff was going to reject it, and Your Honor was going to say go back and do it all over again." Tr. p. 14.

Thereafter, at the document production session which occurred at Lock Haven, Mr. Reeder testified that the only document he had in his possession was the published version of the Irish government crash report and that he had not asked anyone else at Piper whether they had any documents or information relating to the crash, Tr. p. 152. The Irish report specifically states in the synopsis that Piper participated in the investigation and it is undisputed that Calvin Wilson, Jr., the Director of Piper's Engineering Department, flew to Ireland for the purpose of participating in the Irish investigation. Also, at the Lock Haven production session, Mr. Anania stated:

"We will attempt to determine the existence of any reports which were not contained in Mr. Reeder's file. If there are such reports, we will make them available to you." Tr. p. 153.

Subsequently, in its status report filed on July 21, 1982, the defendant stated:

"Although Mr. Reeder made it very clear in his deposition, defendant will reiterate that Piper has no documents relating to the investigation of the subject accident, other than the Irish report and associated papers, all of which are in the possession of Plaintiff," p. 9.

(In his order of November 17, 1983, Judge Paine noted the conflicting representations by the defendant as a matter of concern, see pages 9 through 10.)

At the evidentiary hearing conducted on March 8, 1984, plaintiffs produced, as Exhibit 3, a copy of a two-page letter dated January 19, 1978 on Piper stationary from Mr. Donald P. Zurfluh, Assistant Chief Engineer at Piper, to Mr. Paul Alexander of the National Transportation Safety Board (NTSB), in which he answered specific questions propounded by the Irish government which related only to the subject crash. I note that the letter indicates on

its face that the NTSB had previously sent a letter to Piper requesting this information. Mr. Wilson was unable to explain why that document was not produced in this case, see Tr. p. 40, but subsequently admitted that Mr. Zurfluh was still employed at Piper and was under his direction and control, see Tr. p. 70.

There are only two possible explanations for this series of events. One is that Piper possessed documents relating to the crash at the time the objection was made to plaintiffs' request for production and that it subsequently disposed of them. It is now undisputed that Piper had such documents in its possession at one time and the only conclusion is that they were either disposed of in some manner or intentionally withheld. The fact that Mr. Reeder and Mr. Anania had apparently failed to make any search for these documents even after Piper was ordered to produce them at Lock Haven must be considered in this regard.

The only other possible explanation for these events is that when Piper filed its objection to plaintiffs' discovery request its attorney made no inquiry regarding the existence of such documents (despite having sought an extension of time to respond) and he filed the objection without any factual basis whatsoever. This type of conduct can only be construed as improper and misleading. The objection filed by the defendant implied the existence of documents other than the Irish report since that document was already a part of the record, see Request for Admission, October 2, 1981, and was a government document to which none of the objections could apply. Furthermore, under this possible explanation, counsel for Piper deliberately misled Judge Paine at the hearing on May 18, 1982 regarding the existence of such documents.

Under either of the explanations discussed above, Piper has engaged in discovery misconduct which warrants sanctions. While Judge Paine did impose a sanction against Piper for its deceptive conduct in his November 17, 1983 order there was no evidence at that time to indicate that any documents other than the Irish report were ever possessed by Piper. Such evidence was revealed at the hearing on March 8, 1984 and the fact is now undisputed. That revelation casts a different light on the situation and supports the imposition of more severe sanctions.

CALSPAN REPORT DOCUMENTS

On October 1, 1981, plaintiffs filed a request for production of documents which included in paragraph 3 the following request:

"All flight test data or documents give [sic] Calspan Corporation by PAC [Piper] and all data or flight test data developed in connection with the Calspan Corporation report commissioned by the NTSB after the crash of a PA–31T aircraft at Bressler, Pennsylvania, and all documents relating in any manner to the study undertaken by Calspan Corporation which resulted in said report, or to the preparation or initiation of said study."

Defendant filed its objection to that request on October 30, 1981 stating:

"The Defendant objects to this Request on the grounds that it is irrelevant and immaterial to the issues raised herein; beyond the scope of reasonable discovery contemplated by the Federal Rules of Civil Procedure; overly broad and burdensome; vague and ambiguous; unlimited as to time and scope."

The Court notes that the Calspan report was commissioned by the NTSB in conjunction with its investigation of the Bressler accident. That accident involved a Cheyenne II crashing soon after takeoff and the Calspan report was intended to assess the longitudinal flying qualities of that aircraft at various c.g. locations. The study was critical of the plane's handling characteristics, see Report p. 12, and it is undisputed that Piper conducted flight tests for the study, see Report p. 2.

Judge Paine's orders of December 31, 1981 and June 11, 1982 directed the production of all flight test data. Furthermore, in his November 17, 1983 order, Judge Paine specifically noted the defendant's failure to

produce the documents relating to the Calspan report as a violation of his previous order. At the document production session in West Palm Beach on January 6, 1984, Richard Reeder stated that Piper had no other documents in its possession other than the Calspan report itself:

> "Just the Calspan report is all we have, and that has been produced. I think we went through that in Chicago." Tr. p. 77.

Mr. Reeder's statement was subsequently reaffirmed by defense counsel, Tr. p. 77. However, on January 9, 1984, certain flight tests relating to the Calspan study were produced by Piper, having allegedly been produced but mislabeled in Chicago. Upon reference to the Calspan report it was demonstrated that the data from these reports was found by Calspan to be unsatisfactory and it was not utilized. Subsequent flight tests were conducted by Piper for Calspan and that data was utilized, see Report, Appendix I–1, but those reports were never produced by Piper, January 9, 1984 Tr. pp. 317–320.

This is another example of defendant's pattern of discovery conduct. In its objections to the plaintiffs' document request, the defendant did not state that it did not possess any of the requested documents, which would, of course, have been a valid objection. Instead, it provided numerous objections including that production would be burdensome, which implied that such documents did exist and were in Piper's possession. However, it did not produce any of these documents at the Lock Haven production session and Judge Paine specifically noted this deficiency in his November 17, 1983 order, p. 7. Thereafter, Piper denied the existence of any of the documents until January 9, 1984. At that time it identified certain documents as being within the category requested by the plaintiffs but, as discussed above, the documents produced were of no value. Furthermore, with respect to the alleged destruction of documents, Piper has made no effort to explain why it retained the unacceptable and useless flight test reports and apparently disposed of the subsequently generated acceptable flight test reports.

## CERTIFICATION PHOTOGRAPHS

Judge Paine's order of December 31, 1981 suggested, and his order of June 11, 1982 directed, the production of all FAA certification documents. As a prerequisite for FAA certification, it is required that certain takeoff and landing tests be performed and documented with stop-action photography. Such tests were performed by Piper with a 8,500 lb. Cheyenne prototype (which was never certified) and subsequently with a 9,000 lb. Cheyenne prototype (which was eventually certified). These latter tests were performed in April 1973 in preparation for the 1974 certification of the PA–31T.

At the Chicago document production session, Piper produced photographs relating to the 8,500 lb. prototype but has never produced those relating to the 9,000 lb. prototype. Richard Reeder stated at the document production session in West Palm Beach on January 6, 1984 that Piper permanently retained documents relating to FAA certification and that these photographs were within that category, Tr. pp. 90–91; see also Piper's Engineering Procedures Manual, p. 011–2. Piper has provided no explanation why it retained the older and seemingly useless 8,500 lb. photos and apparently disposed of the subsequently generated photographs relating to the 9,000 lb. prototype. In Piper's initial reply to plaintiffs' Third Motion to Strike Answer it claims that the photos are irrelevant, but that objection is clearly untimely at this stage of the discovery process. Furthermore, it appears obvious that the photographs are relevant since the Irish accident occurred soon after takeoff and involved the same model airplane. The plaintiffs have also noted in their brief Piper documents that suggest that the SAS system was removed from the 9,000 lb. prototype for the photography tests. Mr. Weil, a former FAA official, stated at the evidentiary hearing on March 9, 1984 that such conduct would have been improper and,

thus, the photographs could be relevant to the punitive damage claim.

## PRODUCT CONDITION REPORTS

On September 14, 1981, plaintiffs requested that documents relating to failed parts of the SAS system be produced. Judge Paine indicated in his December 31, 1981 order that production documents and documents relating to quality control and testing were legitimate subjects of discovery. His June 11, 1982 order required the production of the originals of those documents. Only copies were produced at the Lock Haven production session and at subsequent sessions only copies were produced for the period 1979–1981. Piper Engineering Procedures Manual provides for the retention of originals of these documents for two years, see p. 011–2. Thus, at the time Judge Paine entered his June 11, 1982 order, the originals for the period 1980–1981 should have been retained by Piper. However, Piper has admitted that it destroyed those original documents, January 10, 1984 Tr. pp. 404–405, and Mr. Reeder admitted that he took no steps to preserve those documents, March 9, 1984 Tr. p. 230.

Furthermore, with reference to Product Condition Reports prior to 1979, Piper did not produce any documents at all. While originals of those documents may have been disposed of pursuant to Piper's document retention policy, it is clear that defendant's search for copies was not extensive. Mr. Reeder testified that he only contacted the service department in search of those documents even though the Product Condition Reports were multiple forms which indicated on their face that copies were also sent to numerous other departments, January 6, 1984 Tr. pp. 62–64.

## FLIGHT TEST DATA

On December 31, 1981, Judge Paine suggested, and on June 11, 1982 he ordered, that Piper produce flight test data for the Cheyenne aircraft. At the West Palm Beach document production session, Piper produced originals of certain flight test documents relating to the development of the Cheyenne from 1969 to 1971. The documents were contained in a black looseleaf notebook and were consecutively numbered. In their initial memorandum in support of their motion, plaintiffs noted that five flight test reports and their corresponding data sheets were missing from the notebook and all of them involved either longitudinal stability or flight characteristics at aft c.g. loading (defendant did produce a copy of one of the reports). Defendant did not offer any explanation for the missing documents except to say that it had not intentionally destroyed or withheld any documents from the plaintiffs.

In its initial memorandum in response to plaintiffs' motion, Piper admitted its failure to produce numerous pre-1972 flight test documents but claimed it had made complete production regarding the Cheyenne as certified in 1974. This was subsequently proven to be false. At the hearing on March 9, 1984, the plaintiffs introduced evidence showing that flight test data for 526 test flights was not produced in either original or copy form, see Exhibit 10. Plaintiffs also demonstrated defendant's failure to produce numerous other documents relating to flight test data, see Exhibits 7 and 8. The vast majority of FAA flight test data and approximately two-thirds of the flight test documents relating to longitudinal stability were not produced.

At the evidentiary hearing, Mr. Calvin Wilson, Piper's Director of Engineering, testified that there was no central file for flight test data and that the missing documents could be explained by the lack of an official document retention policy in the engineering department until 1974. The issue, however, is not whether Piper had an official document retention policy prior to 1974, but whether it did in fact retain these documents during that period.

Two of plaintiffs' witnesses, David Lister and James Wrisley, testified regarding the retention of records in the flight test department in the period from 1969–1979. Mr. Wrisley stated that he had worked in the flight test department from 1969 to

1971 and that one of his responsibilities was the maintenance of flight test records, Tr. p. 84. He testified that, other than the documents which were intentionally destroyed, see discussion *infra*, there were records kept in that department regarding every flight test made, Tr. pp. 80–81, 84. David Lister was also a flight test engineer whose responsibilities included the maintenance and organization of the files, Tr. p. 184. He worked in that department from 1969 through 1979. He testified that, other than the documents which were intentionally destroyed, see discussion *infra*, the flight test department kept a copy or an original of each flight test data sheet and report for every flight it made, Tr. p. 183.

The testimony of Lister and Wrisley is corroborated by the testimony of J. Arlington Myers, a former flight test supervisor for Piper, given in the case *Dedman v. Piper Aircraft Corp.*, (No.Dist. of Ohio, C76–168), p. 30. Furthermore, the existence of the black notebook containing the originals of flight test documents, consecutively numbered, also supports their testimony.

Wrisley, Lister, and Myers, who were all intimately involved with the flight test records, stated that the flight test department retained its records in an orderly manner. Thus, when the document retention policy regarding engineering documents was promulgated in 1974, those documents should have been retained until two years "after [the] developing airplane is no longer under engineering control," Engineering Procedures Manual 011–2. Richard Reeder testified that the aircraft in issue in this case was still under engineering control, January 6, 1984 Tr. p. 28, and that the provision of the document retention guidelines quoted above has been effective since the inception of the official policy, Tr. p. 115.

Therefore, I find that the defendant's explanation for its failure to produce these documents is not credible. Further discussion regarding the non-production of flight test documents is contained in the "Destruction of Documents" section, *infra*.

## DESTRUCTION OF DOCUMENTS

On the issue of the destruction of documents, the plaintiffs presented the testimony of former Piper employees, David Lister and James Wrisley. While I rely primarily on their live testimony before me, numerous transcripts of depositions of Mr. Lister, Mr. Wrisley and J. Myers, another Piper employee, taken in cases in which Piper was a party, have been submitted for consideration without any objection.

As noted previously, both Wrisley and Lister had worked as flight test engineers for Piper and were directly responsible for the maintenance of records in the flight test department. Their testimony before me regarding the defendant's policy and practice of destroying documents was remarkably consistent. The policy was initiated in the late 1960's or early 1970's when they received the instruction from J. Myers, the flight test supervisor and their direct superior, to "purge" the department's files, Tr. pp. 84–87, 179–184. The stated purpose of the destruction of records was the elimination of documents that might be detrimental to Piper in a law suit, Tr. pp. 85, 181. Wrisley and Lister were delegated the discretion to determine which documents were to be destroyed, Tr. pp. 85, 181, 204. The initial purging involved hundreds of flight test department documents, Tr. pp. 87, 182. They were also directed to retrieve copies of the detrimental documents from other departments, Tr. pp. 90, 182. Thereafter, the destruction of all potentially harmful documents was an ongoing process, Tr. pp. 83, 186.

Certain physical evidence corroborates the testimony of Wrisley and Lister. The black notebook containing flight test documents, discussed *supra*, had specific flight documents missing, thus supporting their statements that documents were selectively disposed of by Piper employees. The internal memorandum authored by Calvin Wilson entitled "PA–31T PT6–28 Engine Problem," Exhibit 13, was not produced in this case. Lister testified that copies of the memorandum were retrieved for destruc-

tion soon after it had been issued but that he retained a copy. The contents of that document are clearly detrimental to Piper, making it a prime candidate for destruction under the guidelines described by Lister and Wrisley.

Wrisley's and Lister's testimony was also consistent with regard to other misconduct in the engineering department. They both testified that data on flight test documents they had prepared were altered by other Piper employees to make the results of the tests appear to satisfy the required criteria, Tr. pp. 83–84, 185–186. This testimony is corroborated by the FAA decision to restrict Piper's Delegation of Authority as the result of the company's presentation of biased data, Tr. pp. 66–67. This evidence, of course, established an additional motivation for Piper to destroy flight test documents.

The testimony of J. Myers in the deposition in the *Dedman* case corroborates the testimony of Lister and Wrisley. His rendition of the facts is consistent with theirs as to the time frame of the initial instructions and the employees directed to carry out the initial purging, i.e., Lister and Wrisley, Dep. p. 26. He also testified that his instruction to them was to destroy any documents that would be detrimental to Piper in a law suit and that beyond that direction he delegated the selection of documents to Lister and Wrisley, Dep. p. 32. I note that the other deposition testimony submitted is generally consistent with respect to the destruction of documents.

Lister was an employee of Piper until 1979 (after the inception of this law suit) and stated that the policy and practice of destroying detrimental documents was still in effect at that time. Certain physical evidence confirms his testimony. Plaintiffs submitted a copy of a Piper memo dated October 17, 1979 which relates to the PA–31T, Exhibit H. Typed in capital letters at the conclusion of the memo are the words "DO NOT FILE—DESTROY COPY". Obviously, this indicates that normally the document would have been filed and retained but that for some reason this document was to be treated differently, i.e., destroyed. At the evidentiary hearing before me, plaintiffs submitted as Exhibit 2 a copy of a four-page internal memo, dated May 24, 1974, titled "Proposal to Install PA–31T horizontal tail on PA–31P" (a subject admittedly related to longitudinal stability). Stamped on the memo is a control number and date showing that the document was produced by the defendant in the *Buzzard v. Piper Aircraft Corp.* case in May 1981. The defendant has not explained why that document was not produced in this case despite its assertion that it has produced all internal memos relating to the PA–31 in its possession. Additionally, plaintiffs' Exhibit No. 3 at the evidentiary hearing was the letter from Mr. Zurfluh regarding the Irish crash, which was dated January 19, 1978. Piper's document retention policy for the engineering department provides that correspondence should be retained for two years. Thus, under its own internal regulations, that letter should have been retained until at least 1980 at which time this suit was pending. Piper has not explained why that document was not produced. The fact that Piper has not produced a single document (other than the official report) relating to its involvement in the Irish investigation is very damaging in view of defense counsel's representation to Judge Paine on May 18, 1982 that such documents existed. Furthermore, defendant has admitted that it destroyed the originals of the Product Condition Reports for the period 1980–1981 despite Judge Paine's order requiring their production.

Defendants did not impeach either Wrisley or Lister in any significant manner. In its supplemental memorandum Piper notes that Lister's testimony has differed regarding whether Calvin Wilson personally gave him instructions to destroy documents. This is not, of course, a crucial fact and it is somewhat understandable that Lister might be uncertain given the lapse of time and the circumstances. Wilson was the direct supervisor of J. Myers who gave Wrisley and Lister the instructions to destroy the documents, Tr. pp. 79, 178. He was also the direct superior of the subse-

quent flight test supervisors who continued the document destruction program, Tr. p. 178. Both Wrisley and Lister indicated that, based on their experience at Piper and their understanding of the organization, that kind of instruction would not have originated with Myers, Tr. pp. 83, 184. This is consistent with J. Myers' testimony that he was given the instruction by a Mr. McNary in Calvin Wilson's presence, Dep. p. 27. Furthermore, many of the copies that Lister and Wrisley were directed to retrieve were from Calvin Wilson's department, Tr. p. 90. Thus, Calvin Wilson was not a stranger to Piper's practice of destroying documents and, therefore, Lister's uncertainty as to whether Wilson personally instructed him to destroy documents does not render his testimony unacceptable.

Defendant's principal witness to rebut the testimony of Wrisley and Lister regarding the destruction of documents was Calvin Wilson, Jr. I was not impressed with the credibility of Mr. Wilson who appeared to me to be a classic "company man," who would color his testimony in favor of his employer. He has been an employee of Piper for twenty-five years and has worked his way up through the Engineering Department to his present position of Director of Engineering.

On February 27, 1984, Piper filed Mr. Wilson's affidavit in support of its response to plaintiffs' Third Motion to Strike Answer, etc. He stated in that affidavit that he had personally assisted with the compilation of documents for production. Paragraph 4 of the affidavit reads:

"Affiant has read the response of Piper to plaintiffs' Motion to Strike and states that to the best of his knowledge all factual information contained in Sections 1–14 thereof are true and correct."

Mr. Wilson reaffirmed this statement under oath at the evidentiary hearing on March 8, 1984, Tr. p. 9. In Section 1 of defendant's memorandum it stated:

"it is most significant to note that even counsel for plaintiffs has acknowledged that each and every flight test data

sheet, flight test report and modification sheet relating to the Cheyenne aircraft, as certified in 1974, has been produced by Piper." P. 71.

No citation to the record is mentioned and, indeed, the existence of such an acknowledgment by plaintiffs is unlikely. Plaintiffs demonstrated at the evidentiary hearing that defendant failed to produce any flight test documents for approximately 320 Cheyenne flight tests for the period 1973–1974, see Exhibit 10, and failed to produce numerous other documents for that period, see Exhibits 7 and 8. Defendant did not challenge the accuracy of plaintiffs' showing either at the hearing or in its supplemental memorandum. In fact, Calvin Wilson had no difficulty accepting and explaining the defendant's failure to produce those documents, Tr. p. 50. Thus, the falsity of the statement in defendant's response regarding the alleged production of complete records is obvious.

Also in Section 1 of its response, Piper stated with regard to the five missing sets of flight test documents noted by plaintiffs in their initial motion:

"It is clear that the flight test reports which plaintiffs disingenuously describe as 'key' documents do not even relate to the aircraft which is the subject of this law suit."

This factual statement is misleading. The Cheyenne was originally certified in 1972 and the flights noted above occurred prior to that certification. Piper chose not to market that model, rather it continued developing the aircraft further and had it certified again in 1974. However, the 1972 and 1974 models were very similar, being in actuality variations of the same plane. Mr. Wilson admitted at the evidentiary hearing that some of the data gathered in testing the first model was relied upon in the Type Inspection Report for the 1974 model, Tr. p. 65. Furthermore, he admitted that the basic physical change in the aircraft between 1972 and 1974 was the installation of the SAS system, one of the alleged design defects in this suit. It is undisputed that the SAS system is directly

related to the longitudinal stability of the aircraft. Therefore, to say that the missing flight data noted above which involved the longitudinal stability of the 1972 Cheyenne is unrelated to the aircraft in issue can only be perceived as an attempt to mislead the court.

In Section 12 of its response, Piper stated with regard to the Bressler documents:

"Even though Piper was not required to produce documents relating to the Bressler crash, even though all depositions and answers to interrogatories were readily available to plaintiffs from a variety of sources, Piper has voluntarily produced numerous documents including depositions, answers to interrogatories and the investigative report relating to the Bressler crash."

However, as discussed *infra*, defendant was ordered by the Special Master to produce the documents and that order was appealed to me on February 7, 1984. Calvin Wilson, Jr. was present at that hearing as Piper's representative, Tr. p. 4. The Special Master's order and my order were made clear in his presence, Tr. p. 28–31. Furthermore, the issue was extensively discussed on numerous occasions during his deposition in West Palm Beach at which time production of some of the documents was eventually made. Thus, again his affidavit blatantly misrepresents the true facts.

Additionally, I note that at the evidentiary hearing Mr. Wilson refused to describe the FAA airworthiness standards as minimum standards despite the clarity of such description in the FAA Statutes, see 49 U.S.C. § 1421(a)(1), and FAA Designated Engineering Representative Guidance Handbook, Chapter 2, § 7a. This statement is clearly evasive since, as Mr. Wilson must be aware, the applicable regulations are clear and not reasonably subject to alternative interpretation.

My perception of Mr. Wilson as a "company man" is further buttressed by a review of the two internal memos authored by him which have been submitted to me, Exhibit A to plaintiffs' Third Motion to Strike Answer, Exhibit 13 from the evidentiary hearing. (I note that defendant has not challenged the authenticity of these documents.) Those memos reveal a man whose overriding interest is the sale of aircraft and the financial success of the company. Based on my observation of Mr. Wilson and the record in this cause, I conclude that that interest has adversely affected the truthfulness of his testimony before this court.

Additionally, I note another consideration regarding Wilson's credibility. As discussed previously, Wilson is implicated by Wrisley, Lister and Myers in the document destruction campaign. He is also implicated by Wrisley in the alteration of flight test data. Thus, he has an additional personal interest in denying the allegations in order to protect his own reputation and integrity.

With respect to the destruction of documents, Mr. Wilson's testimony was not convincing. He stated:

"[T]he destruction or retention of documents was strictly on the basis of our procedures that we have." Tr. p. 19.

Certain uncontroverted facts contradict this statement. Richard Reeder testified on January 6, 1984 that Piper's document retention policy required permanent retention of documents relating to FAA certification, Tr. p. 90. He also made it clear that the stop-action photographs were considered to be in that category, Tr. p. 91. Yet, those documents were never produced and no explanation has been provided. Furthermore, the defendant has not explained why the useless 8,500 lb. model photographs were retained. Piper also has not explained why, under its document retention program, it retained the unacceptable flight test documents from the Calspan study and disposed of the subsequently generated acceptable flight test documents.

Defendant's other witnesses were Richard Reeder, Piper's legal coordinator, and Mr. Bleck, its president. Mr. Reeder denied the improper destruction of any documents by Piper and claimed to have made an effort to locate and produce all docu-

ments required in the case, Tr. p. 228. However, it is undisputed that he did not preserve the originals of the Product Condition Reports, as required by Judge Paine's order of June 11, 1982. Furthermore, he provided no explanation for the defendant's failure to produce the internal memorandum, Exhibit 2, which had been produced in the Buzzard case. Mr. Reeder did not give any testimony regarding the document retention practices of the engineering department and, thus, his testimony did not rebut, in any manner, Wrisley's or Lister's testimony on that subject.

Mr. Bleck testified regarding the instructions he gave his employees upon being informed of the court's orders requiring the production of documents in Chicago, Tr. p. 117–119. That testimony is not directly responsive to the issues raised in plaintiffs' motion. Mr. Bleck also testified that Piper's policy is to cooperate in litigation and to fully disclose documents in compliance with court orders, Tr. p. 119–120.

Piper has utterly failed to demonstrate that its document retention policy is actually implemented in any consistent manner. The defendant included with its initial response to plaintiffs' motion a copy of a portion of the Corporate Procedures Manual addressing document retention. At the evidentiary hearing, I relied on that document to inquire of Mr. Wilson regarding Piper's means of authorizing and documenting the disposal of records, Tr. p. 71–74. He was unable to answer my questions and it has become apparent that the document submitted to me is virtually irrelevant to the issues before this court. The relevant document retention procedures are contained in the Engineering Procedures Manual which the defendant never introduced into evidence or submitted to the court. The plaintiffs submitted a copy of the relevant provisions in their appendix with their supplemental memorandum. The court obtained the original by examining the boxes of documents which have been kept in the custody of the Clerk's Office since the document production session.

Piper presented no evidence to substantiate Mr. Wilson's claim that the document retention procedures are strictly complied with by Piper's employees. In fact, with the exception of the improper destruction of the Product Condition Reports, discussed *supra*, the defendant did not provide any evidence that the procedures are ever complied with by its personnel. This is particularly shocking in light of my instruction on January 27, 1984 to Piper to detail for me its means of retaining and disposing of documents. My questions at the evidentiary hearing further indicated my concern. Piper's absolute failure to provide any evidence on this issue must be construed as a tacit admission that the policy is a sham.

The plaintiffs had the burden of proving the factual allegations underlying their Third Motion to Strike Answer, etc.: that the defendant had failed to produce the documents and that the defendant intentionally destroyed documents to prevent them from being produced. It is undisputed that the documents in issue were not produced. As to the destruction of documents, the plaintiffs have presented convincing and consistent testimony from two former Piper employees who were responsible for the relevant documents. From my observation of those witnesses, I found them to be credible. Their testimony was corroborated by the physical evidence and the testimony of J. Myers. Furthermore, those witnesses were not impeached in any material way. My observation of the only significant rebuttal witness, Mr. Wilson, indicated he was not credible and my analysis of his testimony in this cause reinforces that determination. His suggestion that the documents may have been lost in the flood of 1972 was effectively rebutted by Mr. Lister's testimony, Tr. pp. 189–190, 192.

Therefore, I conclude that the defendant engaged in a practice of destroying engineering documents with the intention of preventing them from being produced in law suits. Furthermore, I find that this practice continued after the commencement

of this law suit and that documents relevant to this law suit were intentionally destroyed. I would note that I am not the first fact finder to conclude that Piper has intentionally destroyed documents, *see Piper Aircraft Corp. v. Coulter*, 426 So.2d 1108, 1110 (Fla. 4 DCA 1983).

I am not holding that the good faith disposal of documents pursuant to a *bona fide*, consistent and reasonable document retention policy can not be a valid justification for a failure to produce documents in discovery. That issue never crystallized in this case because Piper has utterly failed to provide credible evidence that such a policy or practice existed.

 Having determined that Piper intentionally destroyed documents to prevent their production, the entry of a default is the appropriate sanction. Deliberate, willful and contumacious disregard of the judicial process and the rights of opposing parties justifies the most severe sanction, *see, National Hockey League v. Metropolitan Hockey Club*, 429 U.S. 874, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case. By deliberately destroying documents, the defendant has eliminated the plaintiffs' right to have their cases decided on the merits. Accordingly, the entry of a default is the only means of effectively sanctioning the defendant and remedying the wrong.

## DISCOVERY MISCONDUCT

On January 27, 1984, defendant was ordered by the Special Master to produce by February 6, 1984 documents and depositions from the Bressler case. The documents were not produced by that date. On February 7, 1984, the defendant appealed the Special Master's order to me, raising only a frivolous argument. I rejected it and the defendant was still, at that time, unprepared to comply. Furthermore, it engaged in deceptive conduct by producing some depositions and claiming to have made full production. Subsequently, it was demonstrated that it had not made full

production, see February 7, 1984 Tr. pp. 324–334. The additional depositions were eventually produced but various attached exhibits were not produced until even later.

Defendant's explanation for this conduct was nonsensical:

"Even though Piper was not required to produce documents relating to the Bressler crash, and even though all depositions and answers to interrogatories were readily available to plaintiffs from a variety of sources, Piper has voluntarily produced numerous documents including depositions, answers to interrogatories and the investigative report relating to the Bressler crash." Defendant's Response to Plaintiffs' Third Motion to Strike Answer, pp. 13–14.

(It was clearly demonstrated, however, that some of the depositions were not readily available to the plaintiffs since they were not filed in the Bressler case by agreement of the parties in that case.) Such representations are clearly false and are contemptuous of the orders of this Court.

On January 27, 1984, Judge Knott ordered the defendant to file by February 6, 1984 an answer to plaintiffs' interrogatory regarding changes made in the longitudinal control system in the PA–31T. The defendant did not answer the interrogatory by that deadline but on February 7, 1984 the defendant appealed Judge Knott's decision to me, claiming only that the interrogatory was too burdensome to answer. I granted temporary relief from that order of Judge Knott and granted the parties leave to discuss the matter in their briefs on the Third Motion for Sanctions. On February 14, 1984, plaintiffs limited the scope of the interrogatory in response to defendant's objection and filed a motion to compel a response. Defendant did not file a timely response to that motion, i.e., within five days, see Local Rule 10C, but eventually filed a response on February 24, 1984 in Miami, said pleading not being received in West Palm Beach until February 29, 1984. On February 24, 1984, Judge Knott entered a written discovery order requiring *inter alia* that the new interrogatory be answer-

ed by the defendant by March 5, 1984. No answer was ever provided nor has the defendant ever appealed that decision to me.

On March 23, 1984, four days after the deadline for filing briefs, defendant sent to my Chambers a copy of an affidavit of Calvin Wilson, Jr. which addressed the alleged burden involved in satisfying the discovery request. No explanation was offered why the affidavit was untimely filed nor why Judge Knott's order of February 24, 1984 was ignored.

■ During the deposition of Calvin Wilson, Jr. on February 7, 1984, plaintiffs' attorney asked certain questions regarding the incidence angle of the horizontal stabilizer on certain aircraft. Due to problems in immediately obtaining the necessary documents, defense counsel suggested that the answer be provided through an interrogatory, Tr. p. 401. The exact language of the interrogatory was then agreed upon and the Special Master directed the defendant to file an answer by February 20, 1984. On February 29, 1984, plaintiffs filed a Motion for Rule to Show Cause noting defendant's failure to answer the interrogatory. Defendant filed an answer to the interrogatory on March 6, 1984 but did not respond to plaintiffs' motion until March 19, 1984. In its response defendant suggests that the delay was due to plaintiffs' alleged lack of diligence in filing the written interrogatories (they were served on defendant on February 13, 1984), the illness of Mr. Anania, and the burden of responding to other discovery requests. These explanations are clearly insufficient. The exact language of the interrogatory was agreed to and put on the record on February 7, 1984, thus, there was no reason why the defendant could not prepare forthwith to obey the Special Master's order. The other explanations are also unpersuasive since, even assuming they had merit, an extension of time should have been requested.

On March 19, 1984, defendant filed a Notice of Taking Depositions of "plaintiffs' experts," David Lister, William Kelly and J. Wrisley, for Thursday, March 22, 1984,

at 9:30 a.m., in defense counsel's West Palm Beach office. On March 21, 1984, plaintiffs filed an Emergency Motion for Protective Order with respect to that notice. At no time did defense counsel contact Judge Knott to inform him of these depositions. Judge Knott was first informed of this development when the Court, after receiving plaintiffs' motion, contacted him late in the afternoon on March 21st to inquire whether he was aware of this discovery dispute.

This action by defense counsel violates this Court's previous orders. I stated in open court on December 28, 1983:

"The discovery from here on, in view of the contemptuous conduct thus far in this case, will be before a Special Master of this court who will preside at all hearings starting with the first hearing next Wednesday, January 3rd." Tr. p. 9.

A written order to this effect was entered by me on December 29, 1983. Subsequently, on January 4, 1984, at the first document production session in West Palm Beach, I stated in the presence of all parties:

"Gentlemen, this is Judge Knott, formerly Chief Circuit Judge of Palm Beach County, Florida; and he is the Special Master whom I have appointed to preside over your further discovery and to take whatever testimony is going to be offered by way of deposition or otherwise." Tr. pp. 4–5.

Since that time, all discovery has been conducted in accordance with those orders. Judge Knott has presided at all testimonial discovery sessions and the scheduling has always been arranged through him. Thus, defense counsel's tactics can only be construed as contemptuous of this Court's orders.

Furthermore, the harassing nature of the notice is obvious from a review of the record. Plaintiffs' notice of filing expert resumes was not filed until March 20, 1984. Of the three persons named in defendant's notice, only David Lister is named as an expert for the plaintiffs. Also, it is obvious that the notice gave plaintiffs very little

time to bring these witnesses to West Palm Beach. As the testimony indicated at the hearing before me on March 8th and 9th, David Lister resides in Ontario, Canada and J. Wrisley resides in Pennsylvania. The defendant's urgent need to depose them is somewhat questionable in view of the fact that it interrogated them extensively at the evidentiary hearing and has deposed them numerous times in other similar cases.

On March 23, 1984, the Court received a letter from defense counsel which attempted to explain his conduct in this matter. He stated that after reviewing the Notice of Depositions, "I found that Judge Knott did not receive a copy of this notice as he should have." Even assuming that this omission was inadvertent, this explanation is insufficient. Merely sending a copy to Judge Knott would have presumed his availability for the three consecutive depositions and placed the burden on him to arrange his schedule accordingly. Furthermore, the Notice of Depositions set the depositions at defense counsel's local office despite the fact that all testimonial discovery proceedings before the Special Master have been held in the West Palm Beach Courthouse. Defense counsel's suggestion that plaintiffs' attorneys were at fault for not conferring in good faith with him regarding this discovery dispute is also unpersuasive. As I have made clear, the Special Master is in charge of discovery and the parties in this case do not have the authority, by agreement or otherwise, to schedule discovery hearings in this matter without his participation.

This description of defendant's misconduct is not intended to be exhaustive. There are other examples of defendant's delaying tactics, obstruction, and deception noted elsewhere in this opinion. The Special Master also describes certain actions of the defendant which demonstrate its contemptuous pattern of conduct. Furthermore, a review of the record will reveal other incidents which support this characterization, *see e.g.,* Judge Paine's order of July 17, 1982 and my memorandum of December 22, 1983. This pattern of conduct

warrants the imposition of serious sanctions.

 The entry of a default against a party as a Rule 37 sanction should be rarely utilized, but the Court must be able to enforce its orders and to maintain control over discovery. When a party has consistently disobeyed orders, obstructed discovery, delayed proceedings and made misrepresentations to the court, an extreme sanction is warranted. When a party engaging in such conduct has been previously sanctioned by the court and yet continues the same pattern of conduct, the ultimate sanction is warranted. This is such a case.

 The use of a default as a Rule 37 sanction is controlled by the same guidelines as the use of a dismissal order, *United Artists Corp. v. Freeman,* 605 F.2d 854, 856–857 (5th Cir.1979). In *Marshall v. Segona,* 621 F.2d 763, 768 (5th Cir.1980), the Court discussed the appropriate standards:

"First, dismissal is to be sparingly used and only in situations where its deterrent value cannot be substantially achieved by use of less drastic sanctions. Whether the other party's preparation for trial was substantially prejudiced is a consideration. 'Dismissal is generally inappropriate and lesser sanctions are favored where neglect is plainly attributable to an attorney rather than to his blameless client.' Nor does a party's simple negligence, grounded in confusion or sincere misunderstanding of the Court's orders, warrant dismissal. Finally, the Rule 'should not be construed to authorize dismissal .. when it has been established that failure to comply has been due to inability ...,'" *National Hockey League supra,* 427 U.S. at 640, 96 S.Ct. at 2779, 49 L.Ed.2d at 749. [Footnotes deleted]

In this case the deterrent value of a default cannot be achieved by other means. The defendant and its counsel have already been found to have acted in bad faith for violations of a court order. The defendant was sanctioned in two ways: It was required to pay certain fees and costs of the

plaintiffs and to produce the required documents at its own expense and at plaintiffs' convenience. The Court reserved ruling on the issue of sanctions against Mr. Anania. The defendant has been repeatedly threatened with sanctions since that time. Judge Paine warned the defendant in his order of November 17, 1983. On January 27, 1984, I stated at a hearing:

"As I said, the charges made in plaintiffs' motion are very serious and, considering the sanctions imposed to date in this law suit, if I find that Piper has engaged in any additional discovery misconduct, I do not see how I would have any other choice but to enter a default against it on the issue of liability." Tr. pp. 13–14.

Nonetheless, the pattern of conduct continued.

The entry of a default is also appropriate because the plaintiffs' case has been severely prejudiced by the inordinate delay in getting this case to trial. Defendant's failure to produce certain documents, regardless of whether they were destroyed or not, has hampered plaintiffs' preparation and the plaintiffs' attempts to obtain this information by other means has been thwarted by defendant's obstruction.

This is not a case in which the client is blameless and the attorney is solely responsible for the discovery violations. Piper has already been found to have acted in bad faith and its discovery misconduct has continued. Furthermore, to the extent any discovery violations are attributable to its counsel, Piper was put on notice regarding his pattern of conduct by Judge Paine's order of November 17, 1983.

Piper's discovery violations cannot be attributed to negligence or confusion. Deadlines were clearly set and the requirements of discovery were obvious. Additionally, the close supervision of the case by Judge Knott and myself provided ample opportunity for clarification.

Neither can defendant's failure to comply with court orders be attributed to inability. When the defendant demonstrated inability to comply with a discovery order, I

granted appropriate relief, *see e.g.*, February 7, 1984 Tr. p. 22.

This is a case where the defendant has demonstrated flagrant bad faith and callous disregard for its responsibility, *see Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir.1976). Piper's conduct has been reprehensible and intolerable. Chief Justice Warren E. Burger recently spoke at the Mid-Year Meeting of the American Bar Association and discussed the problem of discovery abuse. He described it as "a breakdown in the professional standards of the entire profession," and noted that "some lawyers have exploited pretrial discovery with at least an excess of adversary zeal." That is what occurred in this case and the defendant supported and actively participated in that conduct.

Even with the constant supervision of the Special Master and myself, the requisite discovery has not been completed so that the parties can be adequately prepared for trial. Had this case remained on the overburdened docket of Judge Paine, or any of the overworked judges in this district, the supervision required would have made it impossible to maintain an efficient calendar. It is not the court's function to drag a party kicking and screaming through discovery. That is what the defendant required in this case and such conduct must be deterred if the courts are to perform their intended functions, *see e.g.*, *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976).

For each of the two reasons discussed above, the Court grants plaintiffs Third Motion to Strike Answer. The Court hereby strikes defendant's pleadings and enters a finding of liability. The cause will proceed to trial on April 16, 1984 solely on the issue of damages. Additionally, the Court will assess against the defendant the fees and costs of the Special Master and the amount stated in his Interim Report shall be paid by defendant within ten (10) days. The remainder of the Special Master's fees

and costs shall be assessed against defendant by further order of this court.

So Ordered.