United States Court of Appeals,

Fifth Circuit.

No. 91–2396.

Suzanne FRAME, Plaintiff–Appellant,

v.

S–H, INC., et al., Defendants–Appellees,

Allan James, et al., Intervenors–Appellees.

Aug. 5, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before SNEED\*\*, RVLEY, and BARKSDALE, Circuit Judges.

SNEED, Circuit Judge:

Suzanne Frame, described by the district court as a "disingenuous, obstreperous, obfuscating pain," appeals from a judgment in excess of $10.2 million entered against her as a sanction for repeated discovery abuses. It is unfortunate that we cannot put this litigation, which has lingered in the courts for seven years, to a swift end. Because of an inconsistency in the record, we are forced to remand. We do so only for a limited purpose.

I.

FACTS AND PROCEEDINGS BELOW

This case has its beginnings in a suit originally filed in late 1986 by Suzanne Frame and two of her businesses, Tenham Company N.V. and SASI International, Ltd. They sued the named defendants, Manuel Zepeda and two of his interests, S–H, Inc. and Pandor, Inc., alleging RICO violations, fraud, and assorted other causes of action. Much has happened since then and to describe these events requires considerable space. It is a story of gross abuse of discovery procedures tolerated much too long by the district court.

---

\*Senior Circuit Judge of the Ninth Circuit, sitting by designation.

A. *The Genesis*

In her original complaint, Frame charged that Zepeda, between 1984 and 1986, induced her to place over $7 million with Zepeda for the purpose of importing "grey market" perfumes from Europe. Zepeda was to line up "a seller and a buyer at set prices before money was invested and thus [Zepeda] could predict and control profit spread." Zepeda promised a safe return of at least seven percent of the invested monies on a 35 or 42 day trade cycle. Zepeda did not follow through on the perfume venture, says Frame, and the $7 million has disappeared.

On June 3, 1987, the nature of this lawsuit changed drastically; a group of 28 separate investors, who had themselves invested money in the perfume venture at Mrs. Frame's urgings, moved the court to intervene. They alleged that it was Frame who was the true mastermind of the fraud, and that the original lawsuit was merely an attempt to obscure the true nature of the relationship between Frame and Zepeda. The district court granted the motion to intervene on September 4, 1987. The intervenors filed their complaint in intervention later that day, alleging causes of action which, among others, included state and federal securities infringements, RICO violations, common law fraud, and violations of the Texas Deceptive Trade Practices Act.

In addition to the original named plaintiffs and defendants, the intervenors impleaded as third-party defendants S.F. International and Suzanne De Lyon, Inc., both Texas corporations with whom Frame was associated and who the intervenors believed now possessed some of their money. To reflect the change in posture, the court realigned the parties, making the intervenors plaintiffs, and grouping the new impleaded parties with Mrs. Frame, Tenham, and SASI, as defendants. Zepeda and his companies remained in the case as a second distinct group of defendants. The case was restyled *Allan James, et al. v. Suzanne Frame, et al. v. S–H Inc., et al.* For ease of reference, we will refer to the intervenors-realigned-as-plaintiffs as simply the "James group."

B. *The James Group Allegations*

According to the James group's complaint, Frame's scheme worked as follows. Suzanne Frame would attract trusting individual investors with the alluring prospect of "no-risk" income in the grey market perfume importation business. She described to them a proposed transaction much like the one she claimed Zepeda had offered her, only with less profit spread. Frame would "line up a purchaser in the United States, contact a European seller and then arrange for a shipment on behalf of the waiting purchaser." The money was needed, represented Mrs. Frame, to secure a letter of credit for the purchase price of a given quantity of perfume. The money received from the American purchaser, and not the cash contributions from the local investors, would be used to pay the European supplier. This, according to the complaint, would result in "the letter of credit not being drawn and the capital remaining safely on deposit in the United States." There was, on the part of the James group, some vague awareness of an ill-defined relationship between Frame and Zepeda. However, it was their understanding that Suzanne Frame would scrupulously supervise and control the funds at all times, and that the investment was virtually risk free.

The transaction itself would begin with a transfer of funds by an investor to a Frame-controlled entity. Frame would then acknowledge receipt of the funds by letter, in which she would agree to return the capital in a specified period of time along with a sum of approximately three percent of the capital contribution. Frame called the additional amount a "commission." Along with the letter, Frame provided the investor with a promissory note in the amount of the capital contribution, due six weeks after it was executed. These notes did not state any interest. When the six weeks expired, Frame encouraged the investors to forego any return of capital and instead reinvest the funds for another six week period. According to the James group, Frame promised that the transactions had been sanitized by her legal counsel, and that they did not violate Texas usury laws.[1]

Between the summer of 1985 and November of 1986, Frame managed to raise almost $3

---

[1] A promise which has since proved quite hollow. In *Najarro v. SASI Int'l,* 904 F.2d 1002 (5th Cir.1990), *cert. denied,* ___ U.S. ___, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991), we found that the identical arrangement was usurious as a matter of Texas law.

million from the separate investors, whom we have called the James group. On Christmas Eve 1986, Frame informed them that she would be unable to return any more money. The James group claimed that over $1.5 million of the capital contributions was and remains outstanding.

C. *Early Pretrial Maneuvering*

On March 31, 1988, the court entered its scheduling order, setting a discovery cutoff for November 1, 1988, and a trial date of January 31, 1989. After switching counsel, the James group served Frame with its first "Request for Production of Documents and Things" on June 20, 1988. Frame did not comply with the request to the James group's satisfaction. With the discovery deadline steadily approaching, the James group moved to compel discovery on August 9, 1988, alleging that "phone calls had not been returned" and that "documents had not been produced." A week later, the court responded in a spirit of tolerant optimism (which proved to be misplaced) and instructed the parties to "work out" the discovery disagreements informally.

On September 30, 1988, the James group filed their second motion to compel. This time they informed the court that Frame had given them an excuse, which they distrusted, that "many of the documents requested no longer or never existed." Again the court responded with the hope that discovery disputes could be resolved amicably, and by order dated October 5, 1988, carried the motion to compel in order to "allow settlement."

On October 28, 1988, the James group supplemented the September 30 motion with an attachment of correspondence between the opposing counsel. Listed were documents which had been identified at an earlier meeting between the parties on October 17, 1988. According to the supplement, Mrs. Frame and her counsel had still not produced even the identified extant documentation.

At a hearing on December 5, 1988, convened for unrelated purposes, the discovery question

was raised again. Obviously, the original November 1 deadline was no longer feasible; the James group was still alleging that they had been unable to secure meaningful discovery from Mrs. Frame, and the September 30 motion to compel (supplemented on October 28) had still not been ruled upon. From the bench, the court gave Mrs. Frame until noon on December 16, 1988, to comply with the request for production filed in June.[2]

D. *The Second, and More Aggressive, Phase of Discovery*

The deadline passed without any action from Mrs. Frame or any of her companies. In response, the James group adopted more aggressive tactics. On December 19, 1988, they asked the court to enter a default judgment against Frame and to award sanctions. They followed that filing two days later with a motion for a temporary restraining order, a preliminary injunction, and a declaratory judgment. The James group expressed fears that an expensive venture undertaken by the impleaded defendant Suzanne De Lyon, Inc.[3] was being funded by their money. They asked the district court to declare, pursuant to Fed.R.Civ.P. 57, a constructive trust on all of the defendants' assets, and sought to enjoin the defendants from destroying or concealing records and from transferring assets out of the United States or Texas. The James group also sought an order requiring Mrs. Frame to comply with the discovery process and to provide "detailed financial statements and reports."

The following day, December 20, Mrs. Frame produced for the first time some documents. In their brief on appeal, the James group describes this first round of document production as "a

---

[2]The December 5 hearing was not, for some reason, made part of the official record before us. Belatedly, the district court confirmed its oral ruling of December 5 on December 19 with a formal signed order, which is a part of the record.

[3]Suzanne De Lyon, Inc. had launched a high profile campaign to manufacture and market a perfume which Mrs. Frame had dubbed "Animale." The fragrance was reportedly created for Mrs. Frame's personal use in Europe, and she now wished to make the scent available to the American retail market. The launch received some amount of publicity, which can be attributed to advertisements depicting famous New York models that ran in a number of national fashion magazines. There was also, at least as represented in the advertisements, an exclusive introductory marketing arrangement with Bloomingdale's.

joke," and expressed similar sentiments to the district court at a compliance hearing on these matters on December 22, 1988. At that hearing, they also renewed their concerns about missing or destroyed documents, and again asked the court to require Mrs. Frame to account for the whereabouts of any document requested but not produced.

The court agreed and ordered Mrs. Frame to produce by noon on December 29 "copies of everything in [the James group's] request categorized by ... chronological or some other order." The court also required Mrs. Frame to explain, by sworn affidavit, why any given document was missing:

> I want her to say she doesn't have it now, that she never saw it and never had it or she saw it and Zepeda had it or she saw it and threw it away or shredded it, and if she did that, I want to know when. *If it's after the lawsuit was filed, she is in trouble.* (emphasis added)

As to the request for sanctions and other relief, the court decided to "carry that" and wait "to see what the response looks like." At the request of counsel, the compliance date was moved back to January 4, 1989. Another compliance hearing was set for January 6, for which the court required Mrs. Frame's physical presence.

On January 4, Frame delivered (albeit a few hours late) 20 boxes of documents.[4] In their appellate brief, the James group describes the contents of this production:

> The majority of the documents did not indicate what they were, nor were they marked pursuant to order of the court. A review of the documents indicated that most of the boxes were blank documents and invoices from Mrs. Frame's coconspirators, S–H, Inc. and Mr. Zepeda. Missing from the documents requested and ordered by the court to be produced were general ledgers of Mrs. Frame's companies, computer-generated general ledgers, balance sheets and profit/loss sheets for the Frame entities, backup tapes for computer entries, payroll and personnel ledgers, computer-generated wire transfer ledgers, [etc.].

They attempted to substantiate this position before the district court with a formal pleading filed the day of the January 6 hearing. Attached was an affidavit sworn to by a former employee of Mrs. Frame which stated that it was the practice of Tenham, SASI, and S.F. International to maintain

---

[4]More precisely, four boxes were delivered at 1:00 pm, and the remaining 16 at 5:20 pm.

"general and subsidiary business ledgers" and payroll records on both the company computer and on "hard, handwritten copies."

By the January 6 hearing, the court's patience had worn thin. Moved by the James group's concerns about disappearing assets, the court issued a temporary injunction against Suzanne Frame personally, Tenham, SASI, S.F. International, and Suzanne De Lyon, Inc. The court formally enjoined the Frame entities from destroying documents and transferring assets, and it sharply limited their ability to distribute funds (including for payroll), take on new debt, and repay old debt.

Moved also by the James group's portrayal of the document exchange process, the court again ordered full compliance with the old June 20, 1988 "Request for Production of Documents and Things," and gave Mrs. Frame until close of business January 13, 1989, to do so. This time the order took on a more ominous tone. The court personally advised Mrs. Frame: "[T]his is no time for nice distinctions.... The time for sophomoric cleverness is long past. I want everything, I want it organized and produced. Is that clear?" Frame responded: "Yes sir." The court continued, "I want you to understand that this is your last chance," and advised her that she had "a serious burden to establish what happened to these people's money." Again she responded: "I understand that, Your Honor." The court then levied $10,000 of "partial sanctions" against Frame for noncompliance with court orders, and set a final compliance hearing for February 3, 1989.

E. *Sanctions Urged to be Imposed on Frame by James Group*

On February 2, as a prelude to the hearing set for the following day, the James group filed a motion which they styled "Supplemental Motion to Strike Pleadings and for Sanctions, and in the Alternative, for the Imposition of Receivership." This was a 22 page pleading with almost two inches of supporting attachments. Its purpose was to seek court imposed relief for reasons other than the merits of the lawsuit. The James group's position was, essentially, that from the production of documents in January it was plain that Mrs. Frame had lied at earlier stages of the litigation about the

existence of documents, particularly crucial accounting ledgers. They also argued that the belated document production indicated that other documents, including ledgers and evidence of foreign bank accounts, should have been in Mrs. Frame's possession or control at one time, but were still not produced. Thus, asserted the James group, "a presumption now arises that [the missing or partially produced documents] have either been destroyed or intentionally misplaced." As punishment, they asked the court to impose the ultimate sanction:

> [The] "Frame Ventures" should be placed in receivership; all fees associated with the receivership should be borne by Defendants ...; additional sanctions should be levied ...; a hearing should be held as soon as possible to determine the actual and exemplary damages to be assessed ...; attorney's fees and costs should be assessed ...; and, should any of the Defendants file for protection under the Bankruptcy laws of the United States, this Court should immediately withdraw any reference to bankruptcy as a result of the intentional and fraudulent acts perpetrated by the Defendants. Finally, [the] Temporary Injunction and Order dated January 13, 1989, should remain in effect.

At the February 3 hearing, the court entertained detailed argument from both sides on the discovery compliance issue, as well as on the issue whether documents had been destroyed. To give Mrs. Frame a chance to respond formally to the massive February 2 filing by the James group, the court continued the hearing until February 10. Mrs. Frame filed a responsive pleading on the morning of February 10. Thus, at 2:00 pm that day, the stage was set for the district court to render a decision on the complaints and allegations by the James group about discovery abuses on the part of Suzanne Frame.

Again, the court entertained detailed argument from both parties. Counsel for Mrs. Frame maintained that, since the court intervention in January, things were proceeding smoothly; they had produced what they possessed, and were now in the process of responding to any exceptions the James group raised. To the James group, things were quite different. The January production had confirmed their worst fears that Mrs. Frame had been hiding assets and lying to the court about the existence of documents. Much more delay, and there would be nothing left to recover.

At the close of the February 10 hearing, the court granted the James group's request to place

Mrs. Frame and her various businesses into receivership and continued its injunction of January 6. The court reasoned that the allegations that Mrs. Frame had destroyed documents or was continuing to obstruct discovery justified the drastic measure of a receivership. The court was particularly troubled with the pattern of discovery that had developed. Each effort at compliance had raised additional questions about the veracity of Mrs. Frame's explanations for missing documents, which, in turn, required more inquest and more delay. The court observed: "What we have ... is every time we get together any deficiency which is pointed out will be cured. But that's not how discovery works." The court continued: "I'm talking about a factual determination that her stories are so inconsistent as to be deliberate obfuscations as to the basis of those documents. Her production has been dishonest, partial, and calculating."

The court made clear, however, that the receivership was not to be a liquidating one. Rather, the receiver was to "preserve, protect, produce, and organize the files, the records, and proceeds of all these businesses, since Mrs. Frame cannot seem to do it." Moreover, the court deferred its ruling on the question of sanctions pending the receiver's report. The court stated: "I am not going to do it now. I have gone to a drastic remedy and we'll see what that produces. When we know what it produces, I may strike her answer."

F. *The "Discovery Receivership" 1989–90*

The first report of the receiver, filed on March 23, 1989, was mixed. It recommended that substantial sanctions be paid to the James group to cover the costs associated with responding to what in fact were, in the eyes of the receiver, past discovery abuses. However, the receiver also found that much of the abuse could be attributed to poor bookkeeping practices, and that the Frame entities were complying in an "excessively cooperative" fashion to the receiver's investigation.

Not surprisingly, the James group took a dimmer view of the state of the litigation after the receiver's initial report. To them, the report once again confirmed what they had been alleging all

along, namely, that Mrs. Frame had purposely withheld documents. On March 27, 1989, the James group filed their "Second Supplemental Motion to Strike Pleadings and for Sanctions, Attorney's Fees and for the Imposition of a Liquidating Receivership." The court did not respond affirmatively to this "supplemental motion," which in large part simply rehashed their earlier February 2 request for relief.

The court, however, was marching to the beat set by the receiver. On March 31, 1989, it did grant sanctions and costs in accordance with the receiver's recommendation. The total amount of sanctions, including those earlier imposed by the court, now stood in excess of $100,000. Also in accordance with the recommendation of the receiver, the court lifted the temporary injunction and ended the receivership for Suzanne Frame personally and Suzanne De Lyon, Inc. The purpose of this action was to allow Suzanne De Lyon, Inc. to continue with the "Animale" project, which the receiver found to be "potentially lucrative."

The months that followed saw a return to at least a semblance of normal litigation proceedings, dominated mostly by a motion for partial summary judgment filed by the James group on May 1, 1989. After a number of hearings and volleys of pleadings, the district court granted summary judgment against SASI (who had become the successor in interest to Tenham) and in favor of the James group on September 19, 1989. The court based the award on the face amounts of the promissory notes (a total of $2,806,000) plus interest, and also awarded attorney's fees in the amount of $165,000.

On August 4, 1989, the receiver filed his second report. This report took on a tone decidedly more negative than the first. The receiver found that "computer memory of general ledger information for SASI, SF International, [and Suzanne De Lyon, Inc.], were erased, destroyed or otherwise eliminated after March of 1987 and most likely in April or May of 1987." By the time the receiver filed his third report, he had become convinced that all computer records had been erased "*after* Mrs. Frame filed the initial lawsuit." In his fifth report, the receiver concluded that original

record entries had been erased and the current entries had been substituted in their stead.

On January 9, 1990, the James group attempted to bring both Suzanne Frame individually and Suzanne De Lyon, Inc. back under the restrictive care of the court, and filed an "Emergency Motion and Application for Temporary Injunction and Receivership." In this pleading, they re-urged the old concerns that Mrs. Frame was frittering away her remaining assets. The motion alleged a new level of animus on the part of Mrs. Frame with respect to her plans for Suzanne De Lyon, Inc. "Obviously," the James group wrote, "Suzanne Frame has a death wish in that she will destroy Suzanne De Lyon, Inc. before any of her creditors will be allowed to obtain any portion thereof." The court denied the motion on January 29, 1990.

On February 26, 1990, the court issued an "Order to Prepare Trial Schedule." On March 1, 1990, however, the receiver filed his sixth report. In that report, the receiver recommended that the court impose the injunction and receivership the James group had asked for the month before. He recommended that a liquidating receiver be placed in charge of Mrs. Frame individually and Suzanne De Lyon, Inc. The receiver stated, "This action should be taken as an equitable action to protect the assets held by defendants."

Mrs. Frame no doubt understood that the receiver set the beat for the court. She, Suzanne Frame, in her individual capacity, and Suzanne De Lyon, Inc. leaped from the court's and receiver's clutches. On March 5, 1990, the district court was notified that they had filed for bankruptcy—not in Texas, but in the Southern District of New York State. That action, of course, caused proceedings to be stayed automatically against Mrs. Frame and Suzanne De Lyon, Inc. pursuant to 11 U.S.C. § 362.

G. *The Bankruptcy Proceedings*

Over a year later, Mrs. Frame's creditors, the James group among them, succeeded in getting

the bankruptcy venue for Mrs. Frame individually transferred to Texas. Venue for the bankruptcy proceeding for Suzanne De Lyon, Inc., so far as we can determine, was successfully maintained in New York, and that case remains there still under that jurisdiction's care.[5]

H. *The Judgment Against Mrs. Frame*

Once back in Texas, the district court orally lifted the automatic stay in this action with respect to Mrs. Frame's individual bankruptcy case,[6] thus allowing this case to proceed against all the Frame entities except Suzanne De Lyon, Inc. By then, the receiver had completely turned against Frame. Mrs. Frame's original bankruptcy petition, at least "in terms of venue," was, found the receiver, "frivolous." In his eighth report, the receiver recommended that the court indeed strike all of appellant's pleadings.

On March 11, 1991, the court finally agreed and struck the pleadings. On April 15, 1991, final judgment was entered in favor of the James group. The court assigned a dollar award of actual damages to each member of the James group. The amount was the same as that reflected in the September 19, 1989 summary judgment. The court then trebled the actual damages pursuant to provisions in the Texas Deceptive Trade Practices Act. Including a separate award of attorney's fees and prejudgment interest, the total award stands in excess of $10.2 million. Other than the bare dollar awards, the district court did not make any findings of fact or conclusions of law.

Mrs. Frame, in her individual capacity alone, has timely appealed that judgment, upon which she is jointly and severally liable.

---

[5]The import of this should not be lost. Suzanne De Lyon, Inc., owner of the "potentially lucrative" Animale perfume venture, seems to be the only significant remaining asset holder of all the Frame-controlled entities named in this litigation.

[6]This was done on March 11, 1990. Apparently, although the record is not entirely clear on this point, the district court withdrew the reference to the bankruptcy judge for Mrs. Frame's personal bankruptcy filing as soon as venue was established in Texas.

II.

JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We will review any finding of fact by the district court for clear error.  *See White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir.1989).  We review questions of law and mixed questions of law and fact de novo.  *See Griffin v. Box,* 910 F.2d 255, 259 (5th Cir.1990).  The imposition of sanctions was a matter of discretion for the district court, which we review for abuse.  *See Lamar Fin. Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir.1990).

III.

DISCUSSION

A. *Did the District Court Err in Striking the Pleadings and Entering Judgment Against Suzanne Frame for Repeated and Manifold Discovery Abuses?*

We have labored through an exposition of the procedural and factual history of this case, in large part, to dispel any notion, as Mrs. Frame now asserts, that the district court "never suggested that it would strike appellant's pleadings before it actually did so."  Mrs. Frame's appeal reminds us that those who extract tolerance from another's mine frequently complain when finally it is exhausted.  As early as December 22, 1988, the court warned Mrs. Frame that there would be severe consequences should it later be determined that documents were destroyed after Mrs. Frame filed her original action against Zepeda.  By February of 1989, the court had had enough of the constant discovery disputes, and decided to settle the matter by placing the Frame entities in receivership.

The express purpose was to "preserve, protect, produce, and organize the files, the records, and proceeds of all these businesses."  Again the court considered the question of sanctions.  Rather than render a decision solely on the pleadings and hearings, which raised detailed factual questions about minutia in the over 100,000 documents that were produced in early January 1989, the court decided to wait and see what the receiver found.  The court specifically warned:  "I may strike [Mrs.

Frame's] answer."

As the receiver became increasingly involved in the dealings of Mrs. Frame, he became convinced near the end of 1989 that there had been willful document destruction and alteration after the beginning of the lawsuit and that Mrs. Frame had engaged in further obstructionist tactics during the receiver's tenure in control of the Frame entities. Based on those revelations, and on the numerous filed motions,[7] the district court finally decided to strike the pleadings. Only because of other procedural delays, caused largely by the parallel New York bankruptcy proceedings, was that decision postponed until March of 1991.

We are quite aware that striking pleadings, which is specifically authorized in cases of extreme discovery abuse in Fed.R.Civ.P. 37(b)(2), is a draconian remedy of last resort. *See, e.g., Sciambra v. Graham News Co.,* 841 F.2d 651, 655 (5th Cir.), *cert. denied,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 115 (1988); *Batson v. Neal Spelce Assoc.,* 765 F.2d 511, 516 (5th Cir.1985). In the end, however, the question is whether the district court abused its discretion. *See Lamar Fin. Corp.,* 918 F.2d at 567. We have thoroughly reviewed the proceedings below and are satisfied that the lower court's actions were appropriate. If subject to any fault, it is that the remedy was tardily applied.

B. *Did the District Court Err by Failing to Make Specific Findings of Fact and Conclusions of Law?*

Mrs. Frame next posits that the district court erred by not making express findings of fact and separately stating its conclusions of law, as she argues was required under the version of civil

---

[7]It is true that much of the James group's many motions for extraordinary relief consisted of unsubstantiated assertions, inflammatory characterizations of Suzanne Frame, or observations that are better described as appropriate for jury argument than support for sanction. However, it is true as well that much in these motions—through verified affidavits—also demonstrated instances of duplicity and obstruction, or at the very least raised profound questions thereto. We have in mind particularly the supplemented motion to compel filed on October 28, 1988, the "Supplemental Verified Motion for Application for Temporary Restraining Order, Preliminary Injunction and Declaratory Judgment," filed January 6, 1989, and also the "Supplemental Motion to Strike Pleadings and for Sanctions," filed on February 2, 1989.

procedure Rule 52(a) then in effect.[8]  We disagree.  That rule expressly states that findings are unnecessary on "motions under Rule 12 or 56 *or any other motion* except as provided in Rule 41(b)." Fed.R.Civ.P. 52(a) (1991) (emphasis supplied).  In turn, old Rule 41(b) is also no aid to Mrs. Frame's position.  Rule 41(b), which governs involuntary dismissal for, among other things, failure to "comply with [the Federal Rules] or any order of the court," only requires Rule 52(a) findings if the court "renders judgment on the merits."  Fed.R.Civ.P. 41(b) (1991).  Here, the court entered judgment against Mrs. Frame for discovery abuse, not because it found any merit to the James group's claims. Rule 52(a) findings were therefore not required under the Federal Rules.[9]

C. *Did the District Court Err by Failing to Hold an Evidentiary Hearing on Damages?*

As we have demonstrated above, the discretion of a district court to award sanctions and render judgment based on those sanctions is quite broad.  That discretion is bounded at its outer limits, however, by constitutional due process concerns.  *See Hovey v. Elliott,* 167 U.S. 409, 417–18, 17 S.Ct. 841, 844–45, 2 L.Ed. 215 (1897).  Typically, we require the district court to hold an evidentiary hearing on damages, even in the case of default judgments such as this one.  *See United Artists Corp. v. Freeman,* 605 F.2d 854, 957 (5th Cir.1979).  The Federal Rules of Civil Procedure make special provision for evidentiary hearings in default situations.  *See* Fed.R.Civ.P. 55(b)(2) ("If, in order to enable the court to enter judgment ... it is necessary to ... determine the amount of damages ... the court may conduct such hearings ... it deems necessary and proper....").

---

[8]The rule provided in pertinent part:

> In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon ... Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in Rule 41(b).

Fed.R.Civ.P. 52(a) (1991).

[9]In any event, as evidenced by our discussion in part III.A, we have had no difficulty, even absent formal findings regarding Mrs. Frame's conduct in this litigation, assessing the propriety of the district court's sanction.  *Cf. Richter S.A. v. Bank of America,* 939 F.2d 1176, 1194 (5th Cir.1991) (even assuming that Rule 52(a) findings were required, reversal is still not necessary where a "full understanding of the issues on appeal can nevertheless be determined by the appellate court." (quoting *In re Texas Extrusion Corp.,* 836 F.2d 217, 221 (5th Cir.1988))).

There is, however, an exception to this rule when the damages are for a liquidated amount. *See United Artists,* 605 F.2d at 957.  If the damages can be computed with certainty by reference to the pleadings and supporting documents alone, an evidentiary hearing may not be necessary.  In this case, the James group argues that damages were liquidated by the court on September 19, 1989, when it granted partial summary judgment based on the face amounts of the promissory notes.

We were initially tempted, as the James group urged us, to affirm the damage award on the basis of the summary judgment, which itself is not contested on this appeal.  However, after a more complete review of the record, we find that the district court vacated its summary judgment ruling on October 31, 1989.  This was still an obvious fact of the litigation as late as March 1, 1990, the date the receiver filed his sixth report.  In that report, the receiver specifically noted that the summary judgment issue was still outstanding.  We have searched in vain in the over 500 docket entries for a reinstatement of the summary judgment, and could not find one.

This is the "inconsistency" in the record, to which we alluded at the opening of this opinion.  It requires that we remand for a determination of damages.  From both the pleadings and supporting documents in the record regarding the summary judgment, it is apparent that some portion of the James group's money was returned before disbursements were ended in December of 1986.  The face amount of the promissory notes, therefore, is not a certain computation of the actual damages suffered.  It would be inappropriate to allow judgment based on those face amounts.[10]

On remand, the district court will have to take into account our decision in *Najarro v. SASI Int'l,* 904 F.2d 1002 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991), another case in which some of Mrs. Frame's investors sued to recover on notes issued to them as part of the grey market perfume scheme.  The transactions in the *Najarro* case were structured

---

[10]In the James group's complaint, they pleaded a figure of $1.5 million as the amount outstanding on the notes.  Yet both the final judgment and the vacated summary judgment on which it was apparently based, award actual damages close to $3 million.

identically to those at issue here.  In *Najarro,* we determined that the notes combined with the "commission" provision, which yield an annualized rate of return of 25%, did not escape application of the Texas usury statute, Texas Rev.Civ.Stat.Ann. art. 5069.  As in *Najarro,* the amount the James group may recover on the notes will be limited by "any appropriate penalties and forfeitures associated with a finding of usury under Texas law."  *Id.* at 1011.

A second, related question is whether the district court should be required to take evidence on the issue of "knowing conduct," which triggers the treble damage provision of the Texas Deceptive Trade Practices Act.  *See Tex.Bus. & Comm.Code Ann.* § 17.50(b) (Vernon Supp.1991). We find that the court need not take such evidence, and approve a treble award on the amount the district court deems appropriate on remand.  Unlike questions of actual damage, which must be proved in a default situation, conduct on which liability is based may be taken as true as a consequence of the default.  *See UNL Inc. v. Oak Hills Photo Finishing,* 733 S.W.2d 402, 407 (Tex.Civ.App.—San Antonio 1987);  *see also Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 509 (2d Cir.1991) (approving punitive damage award in a default case under New York law requiring gross, wanton, or willful conduct), *cert. denied,* —— U.S. ——, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992).

D. *Do Alleged Procedural Irregularities Involving the Parallel Bankruptcy Proceedings Require Reversal?*

Mrs. Frame raises two additional arguments, both of which touch on the effect of Mrs. Frame's bankruptcy filings, and both of which we find to be without merit.  First, Mrs. Frame asserts that the district court violated Bankrupt cy Rule 9014, and thereby Mrs. Frame's own due process rights, when it orally lifted the 11 U.S.C. § 362 automatic stay.  However, the court lifted the stay during an open hearing on December 11, 1990.  Mrs. Frame's counsel was present and made no objection to the lifted stay at that time.  Accordingly, there was no violation of due process.

Mrs. Frame also objects to the sequence of events which led to the consolidation of this case

with an adversary proceeding filed by the James group in Mrs. Frame's parallel bankruptcy case and which raised the same claims as those now before us. In this case, the stay from the parallel bankruptcy was lifted on March 11, 1991. Final judgment was entered one month later. On September 13, 1991, however, the court consolidated this case with the adversary proceeding. Although the substance of the two cases (the adversary proceeding and this case) is identical, Mrs. Frame is nonetheless troubled, she intimates, because certain special rules of bankruptcy procedure, and not merely the Federal Rules, would have applied in an adversary proceeding.

However, Mrs. Frame can point to no prejudice as a result of the belated consolidation, and we can see none ourselves. Any error is therefore harmless. Moreover, the district court expressly reinstated the reference to the bankruptcy court for the adversary proceeding (which embodies the final judgment in this case) to determine any dischargeability issues. This is exactly what would have happened had this case remained independent; the James group would have brought the judgment to the bankruptcy court and sought its enforcement. The dischargeability issue would then be litigated in bankruptcy, exactly as will happen now.

## IV.
## CONCLUSION

To summarize, the district court's decision to strike the pleadings and enter a default judgment was not an abuse of discretion. Neither was it reversible error for the court not to enter findings of fact and conclusions of law, because our review was not impeded by the court's failure to comply with Rule 52(a). We must, however, remand so that the district court may hold an evidentiary hearing on damages. The district court is instructed to apply the *Najarro* ruling and Texas usury law in its determination of the actual damages suffered by the James group. It is not necessary for the district court to take evidence on the issue of knowing conduct by Mrs. Frame. She is presumed to have knowledge by virtue of the sanction imposed by the district court. The district court is therefore authorized to treble any actual damages found on remand pursuant to the Texas Deceptive Trade

Practices Act.  Finally, Mrs. Frame's procedural objections dealing with the parallel bankruptcy case are either meritless or harmless.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.