**CENTURY ML–CABLE CORPORA-TION and Century ML–Cable Venture, Plaintiffs,**

v.

**CONJUGAL PARTNERSHIP COMPOSED BY EDWIN CARRILLO and his Wife, Letty Macias Ordonez, Elliot López Pina a/k/a Rafael López, Sergio Strubbe Davila, Sandra Cardona and Pedro Rios, Defendants.**

**No. CIV. 98–1193(PG).**

United States District Court, D. Puerto Rico.

Aug. 23, 1998.

Francisco A. Besosa, Marshal D. Morgan, San Juan, PR, for Plaintiffs.

Vilma María Dapena, St. Bayamón, PR, Raymond L. Sánchez–Maceira, San Juan, PR, for Defendants.

## *ORDER*

PEREZ–GIMENEZ, District Judge.

This matter having come before the Court on the motion of the plaintiffs Century–ML Cable Corporation and Century–ML Cable Venture (collectively, "plaintiffs" or "Century") for an order (i) finding defendant Edwin F. Carrillo Diaz ("Carrillo") in civil contempt of this Court's prior orders, (ii) entering a default judgment against Carrillo, (iii) awarding to Century the costs, including reasonable attorneys' and investigative fees, incurred by it in documenting Carrillo's contumacious actions and preparing the present motion (the "Motion"), and the Court having considered the submissions filed by the parties with respect to the Motion, it hereby makes the following findings and rulings:

### *FINDINGS OF FACT*

On February 25, 1998, Century commenced the above-referenced action pursuant to 47 U.S.C. §§ 553 and 605 seeking, *inter alia,* damages and injunctive relief against the defendants for their modification, distribution and/or sales of fully descrambling cable television decoders with

the intent that they be used to intercept and view Century's scrambled premium and Pay Per View cable television services. On February 26, 1998, the Court entered an *Ex Parte* Order to Show Cause for a Temporary Restraining Order, Preliminary Injunction, Expedited Discovery, and Seizure (the "TRO"), which ordered, in pertinent part, that:

> [T]he defendants, their agents, employees, affiliates and any business entities and/or persons controlled by them, acting on their behalf, or acting in concert with them, are hereby **restrained and enjoined from destroying, altering, removing or secreting any of the defendants' books and records .... including all records stored on computer diskettes or tapes or within computer terminals or otherwise.**

TRO at 4 (emphasis added). The TRO also ordered:

> [P]laintiffs are granted expedited discovery from defendants, any of their accountants or other agent(s) or person(s) acting on their behalf, which may relate to defendants' decoder modification and/or sales business and the location, nature and amount of defendants' assets, including discovery of all business records, banking records and invoices, including all records stored on computer diskettes or tapes or within computer terminals or otherwise, regarding the purchase, sale, modification, storage and distribution of and payment for cable television devices and related equipment by or from defendants ...

TRO at 6–7.[1]

The TRO also provided that the U.S. Marshal Service would execute a seizure at the residences of defendants Carrillo and Elliot López Pina a/k/a Rafael López ("López"). TRO at 7–9. Pursuant to the TRO, the U.S. Marshal Service executed the seizure order simultaneously at the residences of Carrillo and López on February 28, 1998.

At the López residence, investigator Robert Morales, acting on behalf of Century, spoke with López at length and summarized his statements in affidavit form with the intention (expressed to López) that the summary would be signed by López. A copy of the statement ("López St."), translated into English, is attached to the Affidavit of Robert Morales ("Morales aff."). López reviewed the López St. and confirmed that it was accurate, but refused to sign it. Morales' aff. at par. 18.

In brief, López told Morales that he had brought to Carrillo the cable converter-decoder that had been issued to him by Century. Carrillo then modified it so that it would receive all the premium channels and some pay per view services for which Carrillo charged him $200.00. Morales aff. at pars. 4–7; López St. at pars. 1–5. On another occasion in or around December of 1997, López contacted Carrillo regarding problems he was experiencing with the device modified by Carrillo. *Id.* at par. 6. Carrillo then told López that he too was having problems with his cable TV signal, and he indicated that he was concerned that his house was under surveillance. *Id.* at par. 6. They agreed to an arrangement whereby Carrillo would come to López's residence to continue his decoder modification business. *Id.* at par. 9. According to López, this arrangement was contemplated to last for one month, and at the end of 1997, Carrillo paid López $1,000.00 in cash. *Id.* at par. 11. Carrillo continued to use López's residence for his business through January, 1998, but López denied receiving any additional payments. *Id.* at pars. 11–12. López also stated that Carrillo used a laptop computer to conduct his decoder modification business, and used information cards to keep track of his customers. *Id.* at pars. 15–16. Approximately 85 of

---

**1.** Contrary to Carrillo's argument, Opposition ("Opp.") at 2 (The TRO "did not make any reference to a laptop computer"), the TRO, by its terms, clearly covered all times at issue herein.

such cards were recovered at López's residence during the seizure.[2]

On March 4, 1998, counsel for the plaintiffs and Carrillo met. José Vázquez, Century's counsel, advised Vilma Dapena, Carrillo's attorney, that her clients were in contempt of the TRO as they had failed to provide certain accountings ordered by it. *See* Affidavit of José Vázquez submitted in support of Motion ("Vázquez aff.") at par. 3. Vázquez also advised Dapena that the plaintiffs had learned (from defendant López) that Carrillo possessed a laptop computer which he used to clone cable television converter decoder electronic keys as well as records which identified those persons for whom he had modified decoders, and that Century wanted Carrillo to surrender such items. *Id.* Dapena stated at that time that she was unfamiliar with the case and had not yet discussed it with her client. She therefore requested an adjournment of the scheduled depositions, which was granted.

On March 5, 1998, Dapena sent Vázquez a letter stating her concerns that complying with the disclosure and discovery aspects of the TRO might constitute a waiver of her client's constitutional right against self-incrimination. *See* March 5, 1998 letter from Dapena to Vázquez attached as Exhibit "2" to Vázquez aff. The letter did not state that the computer and business records had been destroyed. It must be assumed that if Dapena had authority to assert her client's privilege against self-incrimination, and sufficient knowledge of the facts to make that assertion, that she knew or had been told that the computer and records were in Carrillo's possession.

On March 9, 1998, and prior to the scheduled preliminary injunction hearing, the Court, Vázquez and Dapena met to discuss the outstanding issues. At this time, Dapena indicated that her clients Carrillo and López would consent to the entry of a permanent injunction against them. Vázquez noted that the seizures had not resulted in obtaining certain critical evidence in the case, *i.e.,* Carrillo's laptop computer, which was believed to contain decoder modification programs and/or sales records, and Carrillo's customer list or other relevant sales records.

The Court inquired from Dapena whether her clients would turn over such items and appear for their depositions. She indicated that they had not done so due to their concerns that Century would refer the case to prosecutors and that compliance with the TRO would waive their privilege against self-incrimination. In response to the Court's suggestion, Vázquez represented that if the defendants complied with the TRO and produced the laptop and client list, his clients would agree not to refer the matter to prosecutors (although they would cooperate with prosecutors if an investigation or prosecution of the defendants was undertaken).

Vázquez objected to the suggestion that the items be produced on the following day, stating that there was no reason why they could not be produced immediately. He specifically expressed Century's concern that Carrillo would not comply with his attorney's representations or a Court order requiring production of the items. He recommended that an investigator retained by Century accompany Carrillo from the hearing to the location of the laptop and records, so that they could be promptly turned over without fear of destruction or disposal by Carrillo. At the conclusion of this meeting, the parties appeared in Court and Carrillo's counsel represented to the Court that Carrillo would produce the laptop computer, client list and other records at plaintiffs' counsel's office at 9:00 a.m. the following day. As with Dapena's assertions to Vázquez on the prior day, it must be assumed that

2. Plaintiffs suspect that Carrillo had approximately 700 customers, *see* Affidavit of José Marrero submitted in support of application for TRO at pars. 19, 25 (a cooperating witness had customer number 683), the remaining cards (believed to be in excess of 600), however, are missing.

Dapena had sufficient knowledge of the facts (*i.e.*, the existence if not the location of the laptop and business records), to make such an assertion to the Court.

Later, on March 9, 1998, the Court entered the Order Granting Preliminary Injunction ("Preliminary Injunction").[3] In pertinent part, it ordered:

[T]he defendants shall, by Thursday, March 10, 1998 at 9:00 a.m., produce at the office of plaintiff's counsel the following:

    1. The laptop computer and any other computers, diskettes or computer tapes used by defendants in their decoder modification and sales business, and

    2. Any and all other business records as set forth in the TRO, including but not limited to client lists, regarding the defendants' decoder modification business, and

    3. Written identification of all of their assets, whether individually or jointly owned by others, and it is further

ORDERED, that defendants' failure to comply with the preceding provisions shall immediately subject them to this Court's contempt power, with the possible contempt sanctions including imprisonment until compliance is completed and monetary sanctions[.]

Preliminary Injunction at 3–4.[4]

On the morning of March 10, 1998, while Vázquez was in court on another matter, two items were dropped off at his office, *i.e.*, a list of five names and telephone numbers and a beeper. No letter was included regarding the items to be produced pursuant to the parties' agreement and the Court's order. Consequently, Vázquez sent a letter to Dapena regarding her clients' failure to produce the laptop computer and customer records. The letter also advised her that if the designated items were not produced by 5:30 p.m. that day, Century would be forced to file a civil contempt motion seeking sanctions, including monetary damages and coercive imprisonment. A copy of Vázquez's March 10, 1998 letter to Dapena is attached as Exhibit "3" to the Vázquez aff. The laptop computer and sales records were never produced.

On March 10, 1998, Dapena sent a letter to Vázquez regarding Century's deposing Carrillo and the possibility of settlement of Century's claims against her clients, a copy of which is attached as Exhibit "4" to the Vázquez aff. Despite the fact that Carrillo's time to produce the computer and records pursuant to the Court's order had expired the prior day, the letter made no mention of them.

On March 12, 1998, defendant Carrillo appeared for his deposition. He again failed to produce any computer equipment or business or customer records. Consequently, Vázquez asked Carrillo what had become of the laptop computer and records. Carrillo replied that he had given them to a relative (whom he would not identify) who had destroyed the computer and burned the records and then deposited the remains of both into a garbage can that subsequently was picked up and emptied into the municipal dump.

During the deposition, the transcript of which is attached as Exhibit "5" to the Vázquez aff. ("Carrillo Tr."), Vázquez again asked Carrillo where the records relating to the business were located. He replied that he assumed that they were at

---

**3.** In the Preliminary Injunction, this Court also again ordered:

    [T]he defendants, their agents, employees, affiliates and any business entities and/or persons controlled by them, acting on their behalf, or acting in concert with them, are hereby *permanently restrained and enjoined from destroying, altering, removing or secreting any of the defendants' books and records ....  including all records stored on computer diskettes or tapes or within computer terminals or otherwise.* Preliminary Injunction at 2–3.

**4.** Defendant Sergio Strubbe Dávila did not appear at the hearing, or file any papers with the Court, and the preliminary injunctive relief sought against him was entered without opposition.

the municipal dump in San Juan where garbage finally ends up. Carrillo Tr. at 17. Vázquez then asked Carrillo what happened to the records, and Dapena declined to let him answer the question on the basis of his privilege against self-incrimination. *Id.* (*See also* Tr. at 34 [similar sequence regarding the fate of the laptop computer] ). At Dapena's suggestion, Carrillo then testified that the records no longer existed, and that they had been destroyed, and that such records had pertained to his clients. *Id.* at 19. When Carrillo was asked in what form the records had been, Dapena again raised his privilege against self-incrimination and declined to permit him to answer. *Id.*

In light of the sequence of events set forth above, the Court finds that defendant Carrillo willfully and intentionally arranged for the destruction of his laptop computer and business records. There seems to be no dispute that Carrillo was conducting business with his laptop computer up until the time of the seizure (at which time the TRO was served upon him). Then, on March 9, 1998, Dapena represented to this Court that the items would be turned over on the following day. These facts, coupled with Carrillo's subsequent assertion of his privilege against self-incrimination in response to various questions regarding the nature of his records,[5] leads to the conclusion that such items were destroyed after service of the TRO upon him, if not after the preliminary injunction was issued, in direct violation of such order(s) and for the sole purpose of avoiding production of the computer and records to the plaintiffs in this action.

### CONCLUSIONS OF LAW

In the present case, the Court has found that plaintiffs have proven, by clear and convincing evidence, that defendant Carrillo discarded his laptop computer and his business records in an intentional effort to (i) destroy proof of his liability to Century and (ii) prevent Century from taking steps against his customers to prevent future theft (constituting criminal conduct under 47 U.S.C. §§ 553 and 605) and seek recovery from Carrillo's customers.[6] The Court also finds that plaintiffs have demonstrated, by clear and convincing evidence, that these actions were undertaken in violation of the TRO, at a minimum, and also very likely the preliminary injunction.[7, 8]

---

**5.** In the context of this motion for relief under Fed.R.Civ.P. 37, the Court can and should draw an adverse inference regarding the precise time when Carrillo destroyed his computer and business records from his assertion of his privilege against self-incrimination in response to questions seeking this information. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

**6.** Carrillo unquestionably violated both such directives in a transparent attempt to destroy evidence prejudicial to his position, as well as to insulate his customers who are engaged in ongoing criminal acts. *See e.g. Time Warner Cable of New York City v. M.D. Electronics, Inc.*, 101 F.3d 278, 282 (2d Cir.1996) (seller of pirate cable decoders filed for bankruptcy and refused to comply with pre-bankruptcy orders requiring disclosure of customers, appellate court held that cable operator's request for such information was reasonable).

**7.** Carrillo asserted as a defense to Century's motion that he was unable to read and understand the TRO. Opp. at 7, 8. This argument

undermines Carrillo's argument that he had destroyed the documents prior to service of the TRO upon him, as it implies that the documents were destroyed after service upon the TRO upon him, because otherwise his failure to understand it would be irrelevant. Moreover, even if Carrillo was unable to understand the TRO, as it was written in English, this would not furnish a defense to his refusal to obey it. *See Toure v. United States*, 24 F.3d 444, 445–46 (2d Cir.1994) (English language notice satisfies due process even when recipient does not understand English and is incarcerated and therefore unable to obtain a translation easily), *citing Soberal–Perez v. Heckler*, 717 F.2d 36, 43–44 (2d Cir. 1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984) (providing notice in English to Spanish-speaking claimants of social security benefits not violative of due process); *Hong v. United States*, 920 F.Supp. 311, 315–16 (E.D.N.Y.1996) (Notice of forfeiture in English was not constitutionally inadequate when provided to Cantonese-speaking party). *See also Howard Johnson Co., Inc. v.*

District courts have inherent power to enforce compliance with their lawful orders, or to provide remedies to plaintiffs for losses sustained as a result of a violation of court orders, through civil contempt. *Morales Feliciano v. Hernandez Colon,* 697 F.Supp. 26, 34 (D.Puerto Rico 1987). A district court also has the inherent authority to enter sanctions for discovery abuses. *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991); *Computer Associates Int'l, Inc. v. American Fundware, Inc.,* 133 F.R.D. 166, 168 (D.Col.1990) (*citing Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)).[9] If such abuses are egregious, entry of a default judgment is appropriate. *Reebok Intern. Ltd. v. Sebelen,* 959 F.Supp. 553, 556–57 (D.P.R.1997); *Computer Associates,* 133 F.R.D. at 168 (*citing National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (plaintiff's antitrust action dismissed for failure to respond to interrogatories)); *Telectron, Inc.,*

*Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990) (proper focus of inquiry in civil contempt proceeding is not on the subjective beliefs or intent of the alleged contemnors, but whether in fact their conduct complied with the order at issue).

8. Carrillo, in his Opposition, asserted that the plaintiffs could not prove when the records were destroyed. Opp. at 8–9. The Court has specifically found that such destruction took place after service of the TRO upon him, if not after entry of the preliminary injunction. Even absent this finding, the Court would reach the same result, as it is well established that a party's obligation to preserve evidence relevant to claims against it arises at the time the party becomes aware that claims may be asserted against it. In *Hudson Transit Lines,* the court stated:

> Of course, a party is on notice once it has received a discovery request. Beyond that, the complaint itself may alert a party that certain information is relevant and likely to be sought in discovery. *Finally, the obligation to preserve evidence even arises prior to the filing of a complaint where a party is on notice that litigation is likely to be commenced.*

*Id.* at 73 (citations omitted, emphasis added). *See also Struthers Patent Corp. v. Nestle Co., Inc.,* 558 F.Supp. 747 (D.N.J.1981) ("The proper inquiry here is whether defendant, with knowledge that this lawsuit would be filed, wilfully destroyed documents which it knew or should have known would constitute evidence relevant to this case") (*citing Bowmar Instrument Corp. v. Texas Instrument, Inc.,* 25 Fed. R. Serv.2d 423, 427 (N.D.Ind. 1977)); *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 266–69 (8th Cir.1993) (affirming district court's exercise of inherent power to impose sanctions for pre-lawsuit destruction of evidence); *Capellupo v. FMC Corp.,* 126 F.R.D. 545, 551 (D.Minn.1989) (party sanctioned for pre-lawsuit and pre-discovery destruction of evidence); *Computer Assocs. Intern.,* 133 F.R.D. at 168–69 (court finds it "inconceivable" that after pre-lawsuit settlement discussions party would not have known that destroyed documents would be sought in discovery); *Alliance to End Repression v. Rochford,* 75 F.R.D. 438, 440 (N.D.Ill.1976) (sanctions imposed for party's pre-lawsuit destruction of documents when party had notice that adversary was about to file suit and no showing was made that document destruction was undertaken in ordinary course of sanctioned party's business); *William T. Thompson Co.,* 593 F.Supp. at 1453 ("Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation"); Moore's Federal Practice 3d., § 34.16[4] (noting district court's inherent power to impose sanctions for pre-lawsuit destruction of evidence).

In the present case, the pre-lawsuit investigation establishes that Carrillo was well aware that plaintiffs were investigating his decoder cloning business. *See* Affidavit of investigator José Marrero at par. 29 (defendant spoke in code to customers and subsequently advised customers that plaintiffs had found out about Carrillo's "master box" activities). In fact, Carrillo took steps to conceal his cloning operation from plaintiffs, including speaking in code to customers, Marrero aff. at par. 23, and changing the "master box" from his residence to defendant Cardona's residence to defendant Rios' address within a three-month timespan. Affidavit of Jeffrey Engleman sworn to on February 20, 1998 at pars. 16, 20; Supplemental Affidavit of Jeffrey Engleman sworn to on March 26, 1998 at pars. 3 to 8.

9. In *Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 126 (S.D.Fla.1987), the Court stated that "[t]his power is broader and more flexible than the authority to sanction found in the Federal Rules of Civil Procedure."

116 F.R.D. at 126–28 (dismissing, as a product of Court's inherent powers and Fed.R.Civ.P. 37, action brought by plaintiff who destroyed documents in response to discovery notice); *Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 486 (S.D.Fla. 1984).

The inherent power of a district court has been reinforced by Fed.R.Civ.P. 37(b)(2), which states, in pertinent part:

> If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ... (C) an order striking out pleadings or parts thereof ... or rendering a judgment by default against the disobedient party.

*See Computer Associates*, 133 F.R.D. at 168; *see also Philips Medical Systems Intern., B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir.1992) (affirming default judgment entered as sanction for defendant's failure to continue being deposed); *Frame v. S–H, Inc.*, 967 F.2d 194, 203 (5th Cir. 1992) (court holds that lower court's striking defendants' answer and entering default judgment pursuant to Fed.R.Civ.P. 37 in response to document destruction and other obstructionist tactics was appropriate and, if subject to any fault, was that it was tardily applied); *G–K Properties v. Redevelopment Agency of City of San José*, 577 F.2d 645, 647 (9th Cir.1978) (upholding district court's dismissal of case for discovery abuses, and stating "We encourage such orders").

In *Wm T. Thompson Co. v. General Nutrition Corporation, Inc.*, 593 F.Supp. 1443, 1455–56 (C.D.Cal.1984), the facts of which are analogous to the present case, the court noted that the defendant was subject to sanctions under the court's inherent powers and Fed.R.Civ.P. 37 for knowingly and purposefully permitting its employees to destroy key documents and records. The court determined that striking the defendant's answer and entering a default judgment was appropriate because, similar to the present case, the defendant's destruction of critical documents deprived plaintiff of the evidence it needed to build its case. *Id.* at 1456. *See also Telectron, Inc.*, 116 F.R.D. at 130 ("Both more serious—and certainly less remediable—than a party's failure to respond to discovery requests is the willful destruction of discoverable materials. In cases where such destruction has occurred, default judgment has been deemed the only appropriate sanction under Rule 37").[10]

After concluding that entry of default was the most appropriate sanction, the *Wm. T. Thompson Co.* court discussed at length its reasons for concluding that imposing less severe sanctions (such as an order precluding defendants from introducing certain evidence) would be inappropriate because such sanctions either would have the same result, *i.e.*, certain victory for the complainant,[11] or because they might not fully provide redress (in the context of the litigation) to the complainant for the loss of the evidence, or because they would act to reward the contemnor for its misconduct. *Id. See also Reebok Intern.*, 959 F.Supp. at 557 ("A court is not necessarily required to attempt less severe sanctions before turning to the sanction of dismissal ... nor is a court required to provide an adversary hearing before imposing this sanction"). The Court believes that the reasoning of *Wm. T. Thompson*

---

**10.** The *Wm. T. Thompson* court also noted that defaulting the defendant and dismissing its complaint in a related action were also appropriate sanctions for repeated violations of a Special Master's orders to produce documents (similar to the violations of the District Judge's orders in the present case to preserve and produce records and the laptop computer). The *Wm. T. Thompson* court stated that the defendant's failure to comply with the Special Master's orders was an independent basis (apart from the destruction of documents) for imposing such sanctions. *Id.*

**11.** *See also Telectron, Inc.*, 116 F.R.D. at 135 (same).

**184**

and *Reebok Intern.* is applicable to the facts of this case.

In *Computer Associates*, the court held that employing default as a sanction was appropriate only if (i) the contemnor acted willfully or in bad faith; (ii) that the complainant was seriously prejudiced by the contemnor's actions; and (iii) that alternative sanctions would not adequately punish the contemnor and deter future discovery violations. *Id.* at 169. Analyzing the factors, the court found (i) that the defendant intentionally destroyed evidence after the obligation to preserve it arose and after it had clear notice of that obligation, and concluded that the defendant acted intentionally, (ii) that the destruction of the best evidence relating to the core issue in the case inflicted the ultimate prejudice upon the plaintiff, and (iii) that no alternative sanction would adequately punish the defendant and deter future like-minded litigants.[12] *Id.* at 170. *See also Telectron, Inc.,* 116 F.R.D. at 131 (using same test and reaching same result).

■ Applying the *Computer Associates* test to the present case, Carrillo was on notice as of the date of the seizure (when he was served with the TRO) of the claims against him and, more importantly, of the TRO's prohibition against the destruction of *any records or computers.* Nevertheless, he failed to turn them over to plaintiff in response to a second order specifically directing such production (and again enjoining the destruction of evidence), destroying them instead.

■ Clearly, Carrillo willfully and intentionally violated one, if not both, orders of this Court. Apart from having been specifically identified in both orders, the destroyed evidence obviously was crucial to the case, as the laptop computer would furnish crucial evidence of defendants' decoder key modification programs, and the sales records and client list (possibly contained in the laptop or on diskettes or tapes) provide the best, if not sole, basis for quantifying the precise number of violations and the resulting statutory damages to be awarded to Century.[13] *See* 47 U.S.C. §§ 605(e)(3)(C)(i)(II) and (ii) and 553(b)(3) and (c)(3)(A)(ii) (providing for assessment of statutory damages on a per violation basis). *See also Telectron,* 116 F.R.D. at 133 ("[W]hile it is now impossible to determine precisely what or how many documents were destroyed, the bad-faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction'") (*citing Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985)); *Nation–Wide Check Corp. v. Forest Hills Distributors,* 692 F.2d 214, 217 (1st Cir.1982).[14]

---

**12.** The *Computer Associates* court stated:

Any lesser sanction would allow a party possessing evidence that would insure an adverse result to destroy that evidence with impunity, thus assuring defeat for the opponent while risking only a comparatively mild rebuke. One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he (or she) is tempted to thus evade.

*Id.* at 170.

**13.** Although Carrillo's initial refusal to produce the laptop computer and other business records was based upon his assertion that the privilege against self-incrimination applied to such documents, the privilege does not extend to documents already created voluntarily by him. *United States v. Feldman,* 83 F.3d 9, 14 (1st Cir.1996) (*citing United States v. Doe,* 465 U.S. 605, 610–11, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). Furthermore, as noted in *Feldman,* the "privilege in no way suggests that the person may take affirmative action to destroy evidence—even evidence that he himself has created—once he is aware that authorities are searching for it (or something like it). That act of affirmative misconduct, undertaken with the intent of hindering an extant investigation, is the paradigmatic example of an obstruction of justice"). *Id.* at 15.

**14.** In *Carlucci,* the Court also noted, "The policy of resolving lawsuits on their merits must yield when a party has intentionally prevented the fair adjudication of the case.

Finally, Carrillo's pattern of contumacious actions, and his evasive, recidivist underlying conduct (*see e.g.,* Affidavit of José Marrero dated February 23, 1998 at pars. 3, 23 and 29 [noting Carrillo's evasive business practices and stated knowledge of Century's investigation of him]; Affidavit of Jeffrey Engleman dated February 20, 1988 at pars. 16, 20 [noting change in location of master or mother key device in response to Century's investigation] ) manifests that the sanction of a default judgment is the only sanction which will adequately punish him and deter him and other similarly-inclined litigants. *See Reebok Intern.,* 959 F.Supp. at 557 ("dismissal may generate a powerful deterrent effect"); *Computer Associates,* 133 F.R.D. at 170 ("Destruction of evidence cannot be countenanced in a justice system whose goal is to find the truth through honest and orderly production of evidence through established discovery rules. I hold that nothing less than default judgment on the issue of liability will suffice to both punish this defendant and to deter others similarly tempted"); *Carlucci,* 102 F.R.D. at 489 ("It is not the Court's function to drag a party kicking and screaming through discovery. That is what the defendant required in this case and such conduct must be deterred if the courts are to perform their intended functions").

■■■ It is customary in civil contempt proceedings for the Court to award to a successful complainant its attorneys' fees and related costs necessary to bring the contemnor's violations to the Court's attention. *See e.g. Time Warner Cable of New York City v. U.S. Cable T.V., Inc.,* 920 F.Supp. 321, 327 (E.D.N.Y.1996) (*citing Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)); *In re Hardy,* 97 F.3d 1384, 1390 (11th Cir.1996) (noting that attorneys' fees can be awarded pursuant to the Court's inherent contempt powers).

Carrillo has engaged in contumacious bad faith scorched earth defense tactics in a blatant effort to prevent plaintiffs from proving their case against him. Carrillo's disobeying one or more orders entered approximately two weeks apart clearly required Century to undertake the legal research and drafting necessary to bring this contempt motion in order to obtain the relief sought herein. Numerous courts have held that an award of attorneys' fees is appropriate in a case, such as the present case, where a motion was brought either in contempt or pursuant to Fed. R.Civ.P. 37 in order to seek relief for a party's failure to obey discovery orders or destruction of evidence. *See* Fed.R.Civ.P. 37(a)(4)(A) and (b)(2)(E). *See also Reebok Intern.,* 959 F.Supp. at 559; *Wm. T. Thompson,* 593 F.Supp. at 1456; *In re Turner,* 142 F.R.D. at 77–78;[15] *Telectron, Inc.,* 116 F.R.D. at 135, 137.

Pursuant to the foregoing, it is

**ORDERED** that plaintiffs' motion is hereby **GRANTED;** and it is further

**ORDERED** that a default judgment is hereby entered in favor of plaintiffs and against defendant Carrillo pursuant to Fed.R.Civ.P. 37, and plaintiffs are also awarded as against Carrillo their reason-

---

By deliberately destroying documents, the defendant has eliminated the plaintiffs' right to have their case decided on the merits. Accordingly, the entry of a default is the only means of effectively sanctioning the defendant and remedying the wrong". *Id.* 102 F.R.D. at 486.

15. In *Turner,* the Court, in awarding costs and attorneys' fees to complainant, stated the following:

Even when rejecting an adverse inference, courts impose monetary sanctions for the destruction of evidence. Like an adverse inference, an award of costs serves both punitive and remedial purposes: it deters spoliation and compensates the opposing party for the additional costs incurred. Such compensable costs may arise either from the discovery necessary to identify alternative sources of information, or from the investigation and litigation of the document destruction itself.

*Id.* at 77–78 (citations omitted).

able attorneys' fees and other costs incurred in pursuing the issue of the destroyed evidence and in researching, preparing and filing the Motion, and it is further

**ORDERED** that within 45 days, plaintiffs will submit to the Court a breakdown of their costs and attorneys' fees incurred in pursuit of the present motion, as well as a breakdown of the damages that stem from defendant Carrillo's illegal scheme to steal Cable TV's signal.